# JUAN J. ANGULO

## vs.

## JENNIE HALLAR.

*Negligence of Dentist—Evidence.*

While it is the duty of a professional man, such as a physician or dentist, to exercise ordinary care and skill, it will be presumed, in the absence of evidence to the contrary, that an operation or work performed by him was carefully and skillfully done.                                                    p. 233

In an action against a dentist for alleged negligence, *held* that the evidence failed to show that the necrotic condition of the jawbone, from which plaintiff suffered after the extraction of a tooth by defendant's assistant, was the result of negligence on the part of defendant or his assistant.                        p. 233

*Decided December 2nd, 1920.*

Appeal from the Court of Common Pleas of Baltimore City (HEUISLER, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Webster S. Blades,* with whom was *Harry B. Wolf* on the brief, for the appellant.

*Harry O. Levin* and *M. Maurice Meyer,* for the appellee, submitted the cause on brief.

PATTISON, J., delivered the opinion of the court.

This is an appeal from a judgment of the Court of Common Pleas of Baltimore City, recovered by the appellee, Jennie Hallar, against the appellant, Dr. Juan J. Angulo (a dentist), for the alleged negligence and unskilfulness of his

servant, or employee, in the extraction of the roots of a tooth of the appellee.

The record discloses that the plaintiff, in November or December, 1917, had Dr. McCann, a dentist of Baltimore City, extract one of her teeth, In April, 1918, trouble developed in the locality from which the tooth had been drawn, and she suffered much pain therefrom, which she endured for a month or more, when on Sunday, the 4th day of May, 1918, she went to the office of Dr. Angulo, the defendant, to have him extract the roots which Dr. McCann had failed to take out in the extraction of the tooth by him. Upon entering the office of the defendant she asked for Dr. Angulo, but was told by one, who was afterwards learned to be Dr. Sandtler, that Dr. Angulo was not in, and he said to her, "What can I do for you?" to which the plaintiff replied, "I have the tooth-ache and I think I have got some roots. I had the tooth drawn and I think there is some roots there left." She was then asked why she had not gone to Dr. McCann, the one who had extracted her tooth, and she said "I did not like to go down to him because he did not take the roots out in the first place, and he knew he left them there." Dr. Angulo, she said, had some years before drawn some teeth for her and they had given her no trouble, for which reason she had determined to have him, Dr. Angulo, extract the roots, which she thought were causing the pain from which she was suffering.

Dr. Sandtler then told her, as she says, "to sit down in the chair," which she did; that first he was inclined to the belief that the roots were not there, but upon further examination discovered them and proceeded to remove them. When he had concluded, he said to her "all right, now you can get up." "So, I got up. I do not know how I got up and I went over to the sink and washed my mouth out and I said 'Doctor, I do not believe I can go home.' He said, 'I will fix you up,' and he gave me aspirin tablets, and he said 'you take one of these.' So I took one at his office and I went home." When

she got home, her mouth was still bleeding and hurting her. It continued to bleed until 4 or 5 o'clock of the afternoon of that day, when her jaw began to swell and the pain grew worse. To alleviate the trouble, she used salt water, as she had been told to do by Dr. Sandtler, but the swelling continued and on the next day she called in Dr. France, her family physician, who came to her home about 10 o'clock in the morning of that day. At that time her mouth was not bleeding but, as she says, the swelling "was getting worse all the time" and she could not open her mouth. Dr. France looked in her mouth and gave her some medicine to relieve the pain. On the next day, Dr. France again called to see her. He felt her pulse and told her to keep ·on taking the medicine he had prescribed on the previous day. About the third day after her visit to Dr. Angulo's office, she called him (Dr. Angulo) over the 'phone and told him of her trouble. In response thereto, he called to see her about 4 o'clock of the afternoon of that day, when he asked her "what have you been doing, who has been treating you?" She told him Dr. France, and he said, "you should have come to me," for she had been told by Dr. Sandtler that if she were troubled with her mouth after her return home, she should, at once, come back to the office for treatment; to which she replied, "well, I was not able to come to you, and I did not know what to do, I was so bad off that I called for the family physician." Dr. Angulo then returned to his office and got his syringe with which he syringed her mouth, and on the next day he again went to her home and again syringed her mouth. On this last visit, he told her there was a possibility of hemorrhages resulting from the condition of her mouth and, to avoid that result, he told her she should do no work. But she said she had to do it, as she had no one else to do it for her. She testified that the treatment of Dr. Angulo, at the times referred to, neither reduced the pain or the swelling. In her testimony, the plaintiff stated that Dr. France, after his visit on the 8th of May, did not again call upon her until sent for

on the Sunday following to relieve her of a hemorrhage with which she was then suffering.

Upon seeing the plaintiff, Dr. France decided to take her to the hospital, and this was done on the afternoon of that day. Thereafter the plaintiff underwent two operations. The subsequent condition of the plaintiff, as well as the character and effect of the operations, both of which were performed by Dr. France, is fully stated in the testimony of Dr. France, so we think it unnecessary to further prolong this opinion with what was said by the plaintiff in relation thereto.

Dr. France, when offered as a witness by the plaintiff, testified that about noon on the 5th day of May, 1918, he, at the request of the plaintiff, called at her home, and from existing indications, he found the plaintiff "had hemorrhages of her inferior dental artery," and her face much swollen. He was told of the fact that she had been to the office of the defendant, and had the roots of a tooth extracted. An examination of her mouth disclosed necrosis of the bone or, as he expressed it, a rotting of the bone, and as the result of it, not only had the muscles and the gums around the bone become involved, but pus was exuding from the wound and she, at the time, was running some temperature. He, at that time, curetted the bone, washed out the cavity and packed it with gauze, and endeavored to promote some drainage. On his next visit, the following day, he removed, as he says, quite a fragment of the jaw bone. He attended her daily thereafter but, as he expressed it, "the field was progressive and increased in the face of his efforts to stay it." So, on the 18th or 19th day of May, the plaintiff was carried to the hospital and there, as the Doctor says, "under general anaesthetics, I curetted the jaw and endeavored to relieve the condition through an opening and scraped all the necrotic, or soft granular bone out." The condition, however, continued to progress and a few days later he again operated, at which time he extracted two of her teeth, one upon each side of the

cavity from which the roots had been taken, and again curetted the bone, this time making "an incision along the line of the jaw and going in from the outside." In this last operation, he removed all the surrounding bone that was involved by such necrotic process and again packed it and put her to bed. She then made an uninterrupted recovery.

The plaintiff in her testimony spoke of the cutting away of a large part of her jaw bone, the removal of which took with it two of her teeth. Dr. France, when upon the stand, was asked, "when they talk about a jaw bone being cut away, all that was done was the curetting of the bone, the bone that was affected by this soft or granulated portion of the jaw which had decayed?" Ans. "Yes." "The jaw bones, themselves, are there, aren't they?" Ans. "Absolutely." "Both of them are there?" Ans. "Yes, I simply curetted into the granulated tissue." "And when you say curetted, you mean you scraped the soft or decayed matter?" Ans. "Yes." "And all that was removed, therefore, was the rotten or granulated or affected portions of the jaw bone, which were curetted?" Ans. "The diseased tissue."

The doctor also testified that he removed from the infected area, or jaw, what he thought were two small particles of root. This impression was caused by what, he thought, was the presence of enamel in the granulated parts removed, but in his testimony he stated that the granules so removed were finer than granulated sugar.

The declaration contains two counts. In the first it is alleged that "the defendant, through his assistant, undertook for a fee or reward to attend upon the plaintiff and to extract the roots of two of the plaintiff's teeth, and thereupon the defendant, through his duly authorized agent, and while acting within the scope of his employment, negligently, carelessly, and unskilfully treated the plaintiff," causing the injury complained of. In the second count the defendant was charged in the extraction of said root with the negligent use

of "certain unclean and unsanitary instruments and imple-
ments," from which resulted the injury complained of.

At the conclusion of the plaintiff's evidence the defendant
offered three prayers, directing a verdict for the defendant:
(1) Because of a want of legally sufficient evidence; (2) for
a want of legally sufficient evidence under the pleadings; (3)
and for a want of legally sufficient evidence showing that the
injury complained of was "due to the negligence, want of
skill, or diligence on the part of the defendant," or his al-
leged assistant.  These prayers were all refused, whereupon
the defendant declined to offer further testimony, and offered
three additional prayers; the fourth was granted and the
others, the fifth and sixth, refused; while the plaintiff offered
one prayer, which was granted.  The additional prayers of
the defendant, and the plaintiff's prayer, however, need not
be referred to, or considered, owing to the view we take of
this case.  The judgment being against the defendant, this
appeal was taken.

We have been referred to no cases in this State where a
dentist has been sued for malpractice, nor do we recall any,
but there are a number of cases where physicians and sur-
geons have been sued therefor: *State, use of Janney,* v.
*Housekeeper,* 70 Md. 162; *Dashiell* v. *Griffith,* 84 Md. 363;
*Miller* v. *Leib,* 109 Md. 414.  There is no reason why the
law laid down in those cases should not apply to dentists.

The law as enunciated in the above cited cases is, "that a
physician or surgeon who holds himself out to the world to
practice his profession, by so doing impliedly contracts with
those who employ him, that he possesses a reasonable degree
of care, skill and learning, and he is, therefore, bound to exer-
cise and is liable for the want of reasonable care, skill and
diligence, and he is responsible in damages arising, as well
from want of skill, as from neglect in the application of skill.
*Long* v. *Morrison,* 14 Ind. 595.  The cases are generally
agreed upon the proposition, that the amount of care, skill
and diligence required is not the highest or greatest, but only

such as is ordinarily exercised by others in the profession generally." *Dashiell* v. *Griffith, supra.* And other cases therein cited.

But while it is the duty of the professional man to exercise ordinary care and skill, a duty imposed upon him by law, it will be presumed, in the absence of proof to the contrary, that the operation or work done by him was carefully and skilfully done. And because of such presumption, want of skill, or negligence, cannot be presumed, but must be affirmatively proven. *State, use of Janney,* v. *Housekeeper, supra.*

Involved in the burden placed upon the plaintiff, was the necessity of showing that the professional acts of the defendant, which are alleged to have produced the injury complained of, did in fact cause such injury. In this case, there is little or no evidence showing that fact. The injury complained of was the condition of the jaw bone and its resulting consequences after the extraction of the tooth by Dr. Sandtler. The evidence is that, on the next day after the visit of the plaintiff to Dr. Angulo's office, Dr. France, the plaintiff's physician, found a necrotic condition of the jaw bone, which at that time had involved the muscles and gums surrounding the teeth, or, in other words, as he stated, he found the jaw bone rotting, and he treated it by curetting the bone and taking therefrom the rotten or decayed parts. Such an advanced necrotic condition of the jaw bone could hardly have been the result of anything that Dr. Sandtler did, or failed to do, on the previous day. Dr. France, though produced as a witness by the plaintiff, was never asked what, in his opinion, produced the condition of the jaw bone found by him. Nor did he, the only witness other than the plaintiff, say or attempt to say that the injury complained of was caused by anything that Dr. Sandtler did, or failed to do, on the occasion that the plaintiff was at the defendant's office. But whatever may be said as to the question whether the injury complained of resulted from the extraction of the tooth

by Dr. Sandtler, there is absolutely no evidence showing that the injury complained of resulted from the want of skill or diligence of either Dr. Sandtler or the defendant in the extraction of the roots of the tooth, or in their treatment of the plaintiff thereafter. Nor is there, as admitted by the plaintiff, any evidence found in the record showing the use of any unclean or unsanitary instrument in the extraction of said roots.

The court, therefore, in our opinion erred in not directing a verdict for the defendant. We will, therefore, reverse the judgment of the court below.

> *Judgment reversed, without a new trial, with costs to the appellant.*