JOHNS HOPKINS HOSPITAL *v.* GENDA ET UX.

[No. 24, September Term, 1969.]

*Decided November 13, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, ▮ MCWILLIAMS, FINAN and SMITH, JJ.

*Ward B. Coe, Jr.* and *John F. King,* with whom were *Thomas G. Young, III* and *Anderson, Coe & King* on the brief, for appellant.

*William H. Engelman,* with whom were *Herbert J. Belgrad* and *Berenholtz, Kaplan & Heyman* on the brief, for appellees.

FINAN, J., delivered the opinion of the Court.

This case is before us on appeal from a jury verdict of $50,000 awarded to plaintiffs-appellees for personal injury to their infant son resulting from a fragment of a needle left in his body at the time of a surgical operation upon his heart. The case was tried in the Superior Court of Baltimore City. Before the case was submitted to the jury, defendant Johns Hopkins Hospital moved for a directed verdict. The denial of this motion and the trial court's failure to issue proper jury instructions in regard to proximate cause were the subject of this appeal.

Robert J. Genda, Jr., son of appellees, had been afflicted with a congenital heart disorder since his birth in 1951. He had made annual trips to the Johns Hopkins Hospital from his home in Pittsburgh, Pennsylvania. Finally, in 1960 it was decided that open heart surgery would be necessary to remove an obstruction that was causing eight times the normal pressure to the right ventricle of the heart.[1] Dr. Frank Spencer, operating surgeon, and Dr. R. Robinson Baker,[2] who acted as first assistant, performed the operation. While suturing the incision, the needle which Dr. Baker was using broke. After initially attempting to remove the fragment, a decision was made to leave it as the time factor created additional risks. There was no contention by appellees that this decision was improper. Dr. Baker did not reveal the fact that the needle had broken to the parents since he believed it could cause the child no physical harm and would only upset the parents. Only in 1962 did the child and appellees learn of the needle fragment when an x-ray was taken incident to plastic surgery to excise a keloid scar remaining after heart surgery. Subsequent to learning of it, the child started complaining of chest pains and became frightened to participate in normal, youthful activities.

At the trial the primary issue was whether the breaking of the needle constituted an act of negligence on the part of Dr. Baker, who was an admitted agent of the defendant-appellant. The major evidence introduced by appellees was the following dialogue between Dr. Baker and appellees' counsel at a pretrial deposition.

"Q. Could you express any opinion as to why

1. The operative procedure employed in this case is known as an "infundibulectomy."

2. Dr. R. Robinson Baker, Johns Hopkins University School of Medicine, M.D. 1954; Surgical Intern Johns Hopkins Hospital 1954-1955; Senior Assistant Surgeon National Heart Institute, Bethesda, Maryland, 1955-1957; Assistant Resident in Surgery Johns Hopkins Hospital 1957-1962; Chief Resident in Surgery Johns Hopkins Hospital 1962; presently Associate Professor of Surgery Johns Hopkins Hospital; member of the American College of Surgeons.

this needle may have broken at this particular time? A. Obviously, if it broke, it was put in at the wrong angle.

Q. If it was put in at the wrong angle, you put it in at the wrong angle. Is that right? A. That is correct."

This was the only expert testimony appellees were able to introduce on the issue of negligence. Appellant offered the following dialogue from the same deposition as clarification of the above statement.

"Q. You mentioned suturing and closing. A. Yes.

Q. Did you follow the accepted surgical practice in carrying out this closure? A. Yes.

Q. Did you use the accepted instruments to carry out the closure? A. Yes.

Q. Did you use the accepted procedure in doing it? A. Yes.

Q. Did you employ the accepted technique? A. Yes.

Q. Even as to the insertion of the needle at particular angles, did you follow the accepted surgical practice in that respect? A. Yes.

Q. In spite of the presence of all this, the needle broke. Is that what you mean? A. Yes.

Q. Quite apart from just not sewing the child up at all, was there anything you could have done to prevent the needle from breaking? A. No.

On direct examination, in defendant's case at trial, Dr. Baker gave the following explanation of his deposition testimony:

Q. (Mr. King) Now, in—in using that movement, that which you've demonstrated, you stated in answer to Mr. Engelman's question when he deposed you, Dr. Baker, that it was the wrong angle. You remember that? A. Yes.

Q. Why did you say it was the wrong angle? What do you mean by that? A. I said it was the wrong angle because after the needle had broken, after the fact, really, I decided that I must have put it in at the wrong angle, but I have no way of knowing what that wrong angle is. I said I put it at the wrong angle because it broke after I put it in there.

Q. Was it, would you use the same angle today as you used then?

(The Witness) Yes, I would use the same angle. I literally put thousands, tens of thousands of these sutures in before and since this particular incident, and occasionally the needle breaks. I really don't know why it breaks. Yesterday I tried to break this needle to demonstrate the angle, but I can't break it on purpose.

At the close of the case, appellant renewed its motion for a directed verdict on the grounds that there was insufficient evidence produced to allow a finding of negligence. Because we agree with appellant's contention that a directed verdict should have been granted, we need not consider the appropriateness of the judge's charge to the jury.

We are of the opinion that under the Maryland decisions, and respectable authority from other jurisdictions, in order for the plaintiffs to prevail in this case, it was incumbent upon them to introduce sufficient evidence from which the jury could have determined (1) the standard of skill and care ordinarily exercised by surgeons in cases of this kind and (2) that the defendant in this case failed to comply with those standards.

In *Smith v. Reitman*, 389 F. 2d 303 (D.C. Cir., 1967), a suit against a dentist for injuries sustained from a root extraction, the plaintiff produced an expert who testified that "in view of the patient's response * * * and injury * * * a mistake was made." In affirming a di-

rected verdict for the defendant, Judge (now the Chief Justice of the United States) Burger said for the majority (389 F. 2d at 304) :

"In order to make out a case of malpractice . . . the plaintiff must show that his injury was a result of the failure to use 'that degree of care and skill ordinarily exercised by the profession in his own or similar localities' . . . . He can do this by direct evidence about the standard in his locality and the procedure used in his case, in order to demonstrate that it fell short of that standard. . . ."

Our predecessors some 80 years ago in *State, Use of Janney v. Housekeeper*, 70 Md. 162, 171, 16 Atl. 382 (1889), a case brought under Lord Campbell's Act against two defendant physicians for the alleged wrongful and unskilled performance of a surgical operation upon a woman which allegedly caused her death, laid down the standard which must be observed by physicians or surgeons in such circumstances:

"It was the duty of the professional men to exercise ordinary care and skill, and this being a duty imposed by law, it will be presumed that the operation was carefully and skillfully performed in the absence of proof to the contrary. As all persons are presumed to have duly performed any duty imposed on them, negligence cannot be presumed, but must be affirmatively proved. . . .

This principle is especially applicable in suits against physicians and surgeons for injuries sustained by reason of alleged unskillful and careless treatment. The burden of proof is on the plaintiff to show a want of proper knowledge and skill. . . ." Id. at p. 171.

The Court in *Housekeeper* also approved the following prayer submitted by the defendant:

"That the degree of care and skill to be exercised by physicians and surgeons in the performance of an operation is *not the highest degree of care and skill known to the profession, but that reasonable degree of care and skill which physicians and surgeons ordinarily exercise in the treatment of their patients; and the burden of proof is on the plaintiffs in this case to establish by preponderating evidence a want of such ordinary care and skill in the performance of the operation* and attendance upon the said Matilda C. Janney." Id. at p. 166 (Emphasis supplied).

See also *State, Use of Solomon v. Fishel*, 228 Md. 189, 203, 179 A. 2d 349 (1962); *State, Use of Shockey v. Washington Sanitarium*, 223 Md. 554, 558, 165 A. 2d 764 (1960); *Bettigole v. Diener*, 210 Md. 537, 124 A. 2d 265 (1956); *State, Use of Kalives v. Baltimore etc. Hospital*, 177 Md. 517, 526, 10 A. 2d 612 (1940); *Fink v. Steele*, 166 Md. 354, 171 Atl. 49 (1934); *Angulo v. Hallar*, 137 Md. 227, 232, 233, 112 Atl. 179 (1920); *Miller v. Leib*, 109 Md. 414, 426, 72 Atl. 466 (1909); *Dashiell v. Griffith*, 84 Md. 363, 380-381, 35 Atl. 1094 (1896). See also *Riley v. U. S.*, 248 F. Supp. 95, 97 (D. Md. 1965).

In *Kalives, supra,* this Court stated:

"Before the equitable plaintiffs can recover against any of the defendants, it must be shown by affirmative evidence that they were either unskilled or negligent in their respective capacities, and that such want of skill or care resulted in the death of Mr. Kalives. If either of the above elements is lacking in the proof, then no case for the consideration of the jury has been presented." Id. at p. 526, 527.

The need for expert testimony in a professional malpractice case was pointed out in *Fink v. Steele, supra,* wherein Judge Sloan (later Chief Judge) writing for the court stated:

"In actions for malpractice against physicians and surgeons, 'the main issue of the defendant's use of suitable professional skill is generally a topic calling for expert testimony only * * * and for lack of it the court may rule, in its general power to pass upon the sufficiency of evidence that there is not sufficient evidence to go to the jury.' *Wigmore on Evidence* (2nd Ed.), sec. 2090. There may be cases in which there is such gross negligence and unskillfulness as to dispense with professional witnesses, but this is not one of them. The rules of law in the cases of physicians and surgeons have been held by this court to be equally applicable to dentists. *Angulo v. Hallar*, 137 Md. 227, 112 A. 179; *McClees v. Cohen*, 158 Md. 60, 148 A. 124." Id. at p. 361.

In the instant case, the plaintiffs introduced no evidence whatever, expert or otherwise, regarding the required standards to be observed in an open heart surgery operation.

The plaintiff predicated his entire case on two things. First, that the needle broke, and second, that Dr. Baker when being deposed stated that the needle broke because, "it was put in at the wrong angle."

The plaintiffs vigorously contend that they are not relying on the doctrine of *res ipsa loquitur* and that they have produced expert testimony, in the nature of Dr. Baker's own statement that, "he put it in (the needle) at the wrong angle." The plaintiffs would in effect have the court and jury adduce from this statement of Dr. Baker's, that at one and the same time a standard was established (a proper angle *vis a vis* a wrong or improper angle) and a violation of the same. The plaintiffs place a self-serving and artificial construction on Dr. Baker's statement, for the simple reason that they have taken his statement out of context and with complete disregard for his explanation as to what he meant when he stated the

needle "was put in at the wrong angle." His testimony, wherein he explains this statement, shows that there was no way by which he could tell ahead of time whether he was inserting the needle at the wrong angle, rather than the right angle, other than from the after-the-fact knowledge that it broke. In other words he could not tell prior to making the stitch whether the needle was inserted correctly or not, other than by the successful or unsuccessful carry through of the suture. His statement certainly cannot, without distortion, be said to be an admission of the lack of that skill ordinarily applied. He stated that he used the same motion and angle that he would use were he to perform the same specific act again, and that he had successfully put in the needle in the same manner in similar operations tens of thousands of times.

In the case of *Fink v. Steele, supra,* despite the admissions made by a dentist to the effect that he shouldn't have filled a child's tooth before taking an x-ray, (the tooth having subsequently become abscessed) the court held that such an admission in the absence of any other evidence of negligence or lack of ordinary skill on the part of the dentist, was not sufficient for submission of the case to the jury under the issue of negligence, stating:

> "With all of these so-called admissions, there is in them no legally sufficient evidence that there was any want of reasonable care and skill in filling the child's tooth or that there then existed any symptoms or conditions from which the defendant might have anticipated any such result as followed. 'An admission, to be sufficient, must be an admission of negligence or of lack of the skill ordinarily required for the performance of the work undertaken.'" Id. at p. 359, 360.

The plaintiffs vigorously contend that Dr. Baker's act in putting in the needle at the wrong angle was an iso-

lated and singular act of negligence; and they further analogize it with the act of carelessly dropping a scalpel or a knife on the patient causing him to be cut or dropping some fluid on the patient causing him to be burned. However, we think the analogy fails for the simple reason that the dropping of a scalpel or a knife or acid carelessly on a patient is, fortunately, not a part of any operative technique, whereas the evidence in this case is uncontroverted that the accepted technique to suture the facia (the gristly rectus muscle below the chest cavity) which Dr. Baker was closing, was to use the same motion and angle which he was using at the time that the needle broke.

In spite of the plaintiffs' protestations to the contrary, their argument is scarcely discernible from the doctrine of *res ipsa loquitur*, which this Court has not as yet applied in a malpractice case. In *Bettigole v. Diener*, 210 Md. 537, 124 A. 2d 265 (1956), Judge Henderson writing for the court stated:

> "It is clear under the Maryland authorities that in an action for malpractice the burden of proof is upon the plaintiff to show a want of proper knowledge and skill. *State, use Janney v. Housekeeper*, 70 Md. 162; *Miller v. Leib*, 109 Md. 414; *Angulo v. Hallar*, 137 Md. 227; *Streett v. Hodgson*, 139 Md. 137; *Fink v. Steele*, 166 Md. 354; *State v. Eye, Ear, etc. Hospital*, 177 Md. 517. *The doctrine of res ipsa loquitur does not apply. Negligence cannot be inferred from the occurrence alone.* See also the cases collected in 162 A. L. R. 1275." Id. at p. 541. (Emphasis supplied).

See also Louisell and Williams, *Trial of Medical Malpractice Cases* (1968), par. 14.04, p. 425; Prosser, *Torts* 3d Ed., (1964), Sec. 39, p. 218.

The record in this case being devoid of any evidence that Dr. Baker sutured the abdominal cavity in any man-

ner other than with that reasonable degree of care and skill which a surgeon would ordinarily employ, we are of the opinion that the lower court erred in failing to direct a verdict for the defendant.

*Judgment reversed, appellees to pay costs.*