802 A.2d 483

**Ann MAYER, a minor, etc., et al.,**

**v.**

**NORTH ARUNDEL HOSPITAL ASSOCIATION, INC., et al.**

**No. 1041 Sept. Term, 2001.**

Court of Special Appeals of Maryland.

July 1, 2002.

Henry E. Weil (Belli, Weil & Grozbean, P.C. on the brief) Rockville, for appellants.

Angus R Everton (Robert C. Morgan, Mary Alane Downs Morgan, Shelsby, Carlo, Downs & Everton on the brief) Hunt Valley, for appellees.

Argued before DAVIS, JAMES R. EYLER, SHARER, JJ.

JAMES R. EYLER, Judge.

Ann Mayer (Ann), a minor, by her mother and next friend, Dianne Mayer, and Dianne Mayer, individually, plaintiffs below and appellants herein, appeal from a judgment entered in the Circuit Court for Anne Arundel County, after a jury verdict, in favor of North Arundel Hospital Association, Inc. (North Arundel) and Rudolph Jeffries, Jr. M.D. (Dr. Jeffries), defendants below and appellees herein. Appellants alleged that appellees were negligent in failing to properly diagnose and treat Ann for seizures, causing permanent brain damage. On appeal, appellants contend the circuit court erred in granting a motion for partial judgment in favor of appellees, thereby prohibiting the jury from considering certain acts of negligence. Perceiving no error, we shall affirm the judgment of the circuit court.

## Factual Background

On March 9, 1995, at approximately 7:00 p.m., Dianne Mayer found Ann, her 3–1/2 year-old child, lying on the floor of their home. After efforts to arouse her were unsuccessful, Ms. Mayer called 911. Paramedics arrived and transported

Ann to North Arundel. The paramedics reported they found Ann "unconscious in mother's arms, cyanotic, gurgling respirations." Their assessment was "unconsciousness of unknown etiology." No seizure activity was observed. The paramedics administered medication and established an airway.

Ann arrived at North Arundel's emergency room at 7:41 p.m., conscious with "good respiratory effort." Dr. Jeffries was the emergency room physician. The emergency room record indicates there was "a question of seizure disorder at home."

At approximately 7:51 p.m., Ann "displayed generalized seizure activity." Valium was administered as follows: 1 mg at 7:54 p.m., .5 mg at 7:58 p.m., 2 mg at 8:02 p.m., and .5 mg at 8:04 p.m. At some point between 8:05 and 8:35 p.m., a tracheal tube was inserted. Another seizure was reported at 8:45 p.m. At approximately that time, Ann was administered 1.5 mg of Ativan and, at 8:50 p.m., another 1 mg of Ativan. According to the medical records, Dilantin was ordered at 9:00 p.m., and beginning at 9:10 p.m., Ann was administered 300 mg of Dilantin over a one hour period. At 10:14 p.m., Ann experienced another seizure, and she was administered 4 mg of Valium at 10:20 p.m. At 11:15 p.m., Ann experienced another seizure, and she was administered 1.5 mg of Ativan at 11:22 p.m.

At ten minutes after midnight, Ann was transferred to University Hospital. Ann's condition stabilized, and she experienced no further seizures. Later, Ann was transferred to Kennedy Krieger Institute. Ann had sustained serious and permanent brain damage.

At trial, appellants' position was that Ann suffered from a condition called status epilepticus (continuing or episodic seizures), and appellees failed to diagnose the condition and provide appropriate treatment. Appellees' position was that Ann experienced a seizure, but they had no reason to suspect it was continuing, and they provided appropriate treatment.

At the conclusion of all of the evidence, the court granted a motion for judgment in favor of North Arundel with respect to

any acts other than those committed by Dr. Jeffries. There is no issue on appeal with respect to negligent acts by North Arundel personnel other than Dr. Jeffries.

At the conclusion of appellants' case, appellees moved for a partial judgment, which was denied. At the close of all the evidence, appellees renewed the motion, and in pertinent part, it was granted. The pertinent ruling was that the jury could not consider any acts after 9 p.m. as a breach of the standard of care. Subsequently, as part of the court's instructions to the jury, the court advised the jury that no acts of alleged negligence that occurred after 9 p.m. could be considered as the basis for an actionable claim (the 9 p.m. instruction). Appellants did not object to this instruction. The court expressly distinguished acts of negligence from continuing injury, indicating that the jury could consider the latter.

At some point, the jury presented a handwritten note to the court. While it is not entirely clear, it appears this occurred while counsel were taking exceptions to the instructions given. The note stated:

Please repeat instructions re:

1. 2100 hours [1]
2. blood gas
3. transfer

The court reinstructed the jury as requested, including the 9 p.m. instruction. Appellants objected to reinstructing the jury generally but did not make any specific reference to the 9 p.m. instruction.

The case was submitted to the jury with a verdict sheet as follows:

1. Do you find that Rudolph Jeffries, Jr., M.D., breached the standard of care required of him as an Emergency Room Physician and was thus negligent in his care and treatment of Ann Mayer?

Yes_____ No_____

---

1. 9 p.m.

If your answer to Question # 1 is "yes", proceed to Question # 2. If your answer to Question # 1 is "no", stop.

2. Do you find that Rudolph Jeffries, Jr., M.D.'s breach of the standard of care required of him as an Emergency Room Physician was a proximate cause of Ann Mayer's injury?

Yes_____ No_____

If your answer to Question # 2 is "yes", proceed to Question # 3. If your answer to Question # 2 is "no", stop.

3. What amount of damages do you award to Ann Mayer for:

| | |
|---|---|
| Future medical expenses | $_____ |
| Loss of future earnings | $_____ |
| Pain and suffering (past and future) | $_____ |
| Cost of future care | $_____ |
| Total | $_____ |

The jury answered question # 1 in the negative.

Appellants filed a motion for new trial, arguing that the court erred in granting the motion for partial judgment and in instructing the jury that it could not consider acts after 9 p.m. as a breach of the standard of care. The court denied the motion, and appellants noted an appeal to this Court.

### Contentions

Appellants contend that the court erred in granting the motion for partial judgment with respect to any acts after 9 p.m. and instructing the jury accordingly. In support of that argument, appellants assert they produced evidence of negligent acts after 9 p.m. that proximately caused compensable injuries.

Appellees assert (1) appellants failed to preserve the issue because they failed to object to the 9 p.m. instruction, (2) appellants failed to present any evidence that Ann suffered an identifiable injury as the result of any alleged negligent conduct after 9 p.m., and (3) the issue raised by appellants is moot because the jury found that appellees did not breach the standard of care prior to 9 p.m., and appellants failed to

present any evidence of "separate, different acts of negligence" after 9 p.m.

## Discussion

### Preservation Issue

Maryland Rule 2-420(e) provides that a party may not challenge a jury instruction on appeal unless the party objected after the court instructed the jury and stated distinctly the matter objected to and the grounds for the objection. Appellees assert that the failure of appellants to do so precludes them from raising their issue on appeal.

Appellees argue that the situation is analogous to that presented in *Jones v. Federal Paper Board Co.*, 252 Md. 475, 250 A.2d 653 (1969). We disagree. In *Jones,* the plaintiffs claimed error in failing to grant judgment (at that time, a directed verdict) in their favor against certain defendants. The Court of Appeals pointed out that no motion had been made and quoted from prior cases for the proposition that if a motion is made at the conclusion of the plaintiff's case, it must be renewed at the end of the entire case. *Jones,* 252 Md. at 488–89, 250 A.2d 653. If not, and if there is no objection to jury instructions, there is nothing to review. *Id.* In the case before us, the motion for partial judgment was made and renewed.

Appellees also argue that the issue before us is analogous to the denial of a party's motion *in limine* and the party fails to object at trial to evidence that was the subject of the motion. Again we disagree. One of the cases relied upon by appellees that we find particularly instructive is *Reed v. State,* 353 Md. 628, 728 A.2d 195 (1999). In *Reed,* the defendant moved *in limine* to preclude evidence of other crimes. The Court discussed different types of motions *in limine.* The portion of the holding relevant to us is that if a court determines *in limine* that questionable evidence will not be admitted, except for certain circumstances where a proffer may be required, the issue is preserved without further objection. *Reed,* 353 Md. at 634, 728 A.2d 195 (discussing *Prout v. State,*

311 Md. 348, 535 A.2d 445 (1988)). In the case before us, the evidence in question was excluded, and it was intended to be the final word by the court on that subject. The subsequent failure to object to the instruction that was in accordance with the ruling on the motion did not result in a failure to preserve the issue raised by the motion.

## The Merits

Appellants contend they produced evidence of negligent acts after 9 p.m. that were causally connected to permanent injuries. According to appellants, the negligent acts were failures to prevent recurrence of seizures. The primary focus was on the administration of drugs. Appellants point to testimony by their experts. Dr. Charles Stewart, an emergency room physician, described the use of medications as "chaotic and unwieldy" throughout Ann's stay at North Arundel. He also opined that significant brain damage occurred approximately an hour after the first seizure (7:51 p.m.). Dr. Daniel Adler, a pediatric neurologist, explained that, when a brain is deprived of oxygen or nutrients, it will recover unless and until a threshold is reached, and after that time, permanent injury results. Dr. Adler opined that the risk of permanent brain damage existed 30 minutes after Ann's admission to North Arundel, and that permanent damage had occurred within 30 minutes after her second seizure at the hospital (8:45 p.m.). According to Dr. Adler, the damage progressed throughout her course of stay at North Arundel, with "the substantial quantity" of damage occurring between 10 p.m. and midnight.

According to appellants, even if we assume there was no negligence prior to 9 p.m., the jury should have been free to decide whether Dr. Jeffries was negligent thereafter in failing to anticipate and prevent later seizures. Appellants acknowledge the absence of specific evidence with respect to the extent of the injury caused by such subsequent negligent acts, but argue that such specific evidence was not required. Appellants explain that they proved all they could, and the burden of proof shifted to appellees to show the extent of injury caused by such subsequent negligent acts.

 The general rule in negligence cases, including medical negligence cases,[2] is that the plaintiff has the burden of proving negligence, the existence of an injury, and that the injury was caused by the negligence. *See Fennell v. Southern Maryland Hosp. Center,* 320 Md. 776, 786, 580 A.2d 206 (1990); *Weimer v. Hetrick,* 309 Md. 536, 546–49, 525 A.2d 643 (1987). There are a number of cases that could be cited for the general proposition stated. *See, e.g., Johns Hopkins Hosp. v. Genda,* 255 Md. 616, 621–23, 258 A.2d 595 (1969) and cases discussed therein. We cite *Fennell* and *Weimer* specifically because they illustrate that the Court of Appeals has continued to adhere to principles of causation as they were traditionally understood and applied. The Court, in the two cases cited, discussed whether the loss of a chance of survival (but less than probable survival) should be subject to relaxed rules of causation, or alternatively, whether it should be recognized as a new element of damage. The Court declined to do either and reaffirmed the general rule that a plaintiff has the burden of proving, by a preponderance of the evidence, that a defendant's negligent act caused the death of plaintiff's decedent. *Fennell,* 320 Md. at 786–87, 580 A.2d 206; *Weimer,* 309 Md. at 552–54, 525 A.2d 643.

The loss of chance of survival cases are not factually apposite to the case before us, however. An obvious distinction is that Ann survived, but there are other loss of chances besides survival, *e.g.,* loss of a chance to have a less severe permanent injury. That is not a loss of chance case because the evidence was that Ann's injury was progressive and became more severe over time. There was no loss of a chance; the progression was definite; moreover, as discussed in the next paragraph, there was legally sufficient evidence of causation in fact.

 The tort concept of causation involves causation in fact and a determination as to whether the relationship between the negligent act and the injury is legally cognizable.

---

**2.** There is no issue of informed consent in the case before us.

*See Yonce v. SmithKline Beecham Clinical Labs., Inc.*, 111
Md.App. 124, 137, 680 A.2d 569 (1996). Causation in fact is
frequently discussed as "but for" causation or "substantial
factor" causation. At first blush, it might appear that the
issue before us is one of substantial factor causation involving
multiple alleged negligent acts by a defendant, as distin-
guished from the more usual situation involving alleged acts of
negligence by multiple defendants. Substantial factor causa-
tion primarily addresses the situation where independent
causes produce an injury that would have occurred as a result
of each cause alone. *Yonce*, 111 Md.App. at 138, 680 A.2d 569.
If we assume multiple acts of negligence, there was evidence
that each act was a substantial factor in producing some
injury. The evidence indicated, however, that Ann's injury
became progressively more severe over time so that any
subsequent act of negligence would have caused less than the
entire injury. The substantial factor test answers the ques-
tion whether a defendant caused any injury. In certain
situations, as in the case before us, the question remains as to
what injury was caused by each act of negligence.

Ultimately, then, the questions before us are whether appel-
lants met their burden of producing (1) evidence of negligent
act(s) after 9 p.m., and if so, (2) evidence of the injury caused
by such act(s) or, alternatively, enough evidence to show that
the injury was indivisible or at least to shift the burden to
appellees to show that the injury was divisible.

### (1)

Our review of the record reveals no evidence of a
specific breach of the standard of care after 9 p.m. As pointed
out by appellants, Dr. Stewart did testify with respect to the
"chaotic and unwieldy" use of drugs. When read in context,
however, the explanation of what the witness meant becomes
apparent. Dr. Jeffries ordered Valium, and it was adminis-
tered at 7:54 p.m., 7:58 p.m., 8:02 p.m., and 8:04 p.m. Referring
to those dosages, Dr. Stewart opined that the first dose was
an under-dose, and while the combined amount of the dosages
might have been acceptable, they should have been adminis-

tered over less time. In addition, Dr. Stewart opined that Ann should have been given Phenobarbital approximately one hour after she arrived in the emergency room, and the Dilantin given at 9:10 p.m. should have been ordered and given before 9:00 p.m. All of the asserted breaches occurred at or prior to 9 p.m.

Dr. Stewart also opined with respect to Dr. Jeffries' failure to consult an appropriate specialist, Dr. Jeffries' failure to stay bedside, and a delay in intubation. The issue of intubation related to a time period prior to 9 p.m.

Dr. Adler testified that Ann suffered from status epilepticus caused by fever, and that she sustained brain injury as a result of that condition. Dr. Adler explained that if a brain is deprived of oxygen or nutrients over a period of time, a point of irreversibility occurs, and once that point is achieved, increasing brain injury "takes place over time in an incremental way." In other words, the amount of brain injury is determined by how long the deprivation takes place. Dr. Adler opined that Ann probably had a seizure at home but suffered no brain injury prior to her arrival at North Arundel. At the hospital, Ann had seizures off and on for several hours, and when she left North Arundel, she had severe brain damage. The witness explained that within approximately 30 minutes of status epilepticus, the risk of some type of permanent brain injury occurs. Thus, Dr. Alder concluded that the risk of permanent brain damage existed 30 minutes after Ann's admission to North Arundel, that permanent damage occurred within 30 minutes after her second seizure at the hospital (8:45 p.m.), and that a substantial quantity of the brain injury occurred in the last two hours at North Arundel (between 10 p.m. and midnight).

With respect to a breach of the standard of care, Dr. Adler testified that administering Valium was appropriate (although the dosage could have been higher), but that Dilantin or Phenobarbital should have been given "immediately." He explained that "immediately" meant within ten minutes after arrival at the hospital (by 7:51 p.m.). In Dr. Adler's opinion, if

medical management had been adequate, Ann would have sustained only one seizure at North Arundel, and she would not have sustained a neurological injury.

Dr. Adler testified with respect to Ann's level of functioning as of the time of trial, the extent of her injury, and her prognosis. While at one point he indicated that Ann was allowed to have seizures during her entire stay at North Arundel, he was not asked and did not testify as to whether he could express an opinion as to how her injury would have been affected had there been some change in her treatment between 9 p.m. and midnight. As was true with Dr. Stewart, there were questions and answers relating to issues other than the administration of drugs. As stated previously, with the exception of the issue relating to intubation, those issues are not before us.

In summary, appellants' theory and supporting testimony was that Dr. Jeffries committed negligent acts shortly after Ann's arrival at North Arundel, and that this negligence caused irreversible brain damage beginning at approximately 9 p.m. As a result, at trial, appellants sought compensation for the full extent of Ann's injury. The jury declined to find any negligent acts prior to 9 p.m., but appellants argue that the jury should have been permitted to find negligent acts after 9 p.m. and award damages for the full amount of the injury even though, by appellants' own testimony, such acts would have caused a lesser injury.

On appeal, appellants rely almost entirely on evidence relating to the administration of drugs.[3] In our view, there was no legally sufficient evidence of negligence occurring after 9 p.m. to create a jury issue. *See* Md. Rule 2–519; *Cavacos v. Sarwar,* 313 Md. 248, 545 A.2d 46 (1988). There was no testimony as to any specific breach of the standard of care after 9 p.m. Generalized statements, critical of conduct, are not the equivalent of such testimony. A physician may disap-

---

3. The evidence was legally insufficient with respect to other issues because the witnesses retracted an opinion or failed to provide a causal connection.

prove of the conduct of another physician but still regard that same conduct as being within the appropriate standard of care. This is not a case in which the jury could have decided the issues without expert testimony.

**(2)**

Assuming, *arguendo*, that there was legally sufficient evidence of negligence after 9 p.m., there was no reversible error. Theoretically, the jury could have found that any act or failure to act, before or after 9 p.m., was negligent. Appellants' argument that repeated failures to meet the standard of care caused Ann's injury must be considered in light of the evidence that permanent brain injury occurred at approximately 9 p.m. and became progressively worse.

Under general principles of causation, appellants were required to prove the nature and extent of any injury caused by any act found to be negligent. Restatement (Second) of Torts § 433B(1) (1965) (Restatement). If the jury found that a negligent act occurred before 9 p.m., it could have awarded damages for the entire injury. If the jury found no negligence prior to 9 p.m. (as was its finding), but found negligence subsequent to 9 p.m., it could have awarded damages only for the injury caused by that negligent act. In the latter situation, because there was evidence of permanent injury prior to the negligent act, the question becomes one of apportionment of damages between two or more causes. We point out that in this context we are talking about causal, not fault, apportionment.

Generally, damages for harm are to be apportioned among two or more causes where (1) there are distinct harms, or (2) there is a reasonable basis for determining the contribution of each cause to a single harm.[4] Restatement § 433A(1). Damages for any other harm cannot be apportioned among two or more causes and a wrongdoer is liable for the full

---

**4.** The term "injury" used throughout this opinion to describe Anne's brain damage is synonymous with the term "harm" used in the Restatement. We use the terms interchangeably.

extent of the harm. *Id.* § 433A(2). Multiple causes may include the combination of acts of (1) two or more parties, (2) an innocent act and a negligent act, or (3) an aggravation of a preexisting injury. *Id.* § 433A cmts. a and e. Here, in order to analyze whether prejudicial error occurred, we assume that acts prior to 9 p.m. were non-negligent and that at least one act subsequent to 9 p.m. was negligent. Because there was evidence of permanent injury prior to the negligent act, the question becomes one of apportionment of damages between an innocent act and a negligent act, both attributable to the same party. The permanent injury that existed prior to the negligent act is equivalent to a "preexisting" injury, and the subsequent act—its aggravation.

In our view, the answer to the question before us is simply a variant of the general rule that a plaintiff has the burden of showing an aggravation of a preexisting condition. In that circumstance, a defendant is liable only for the aggravation. *Seites v. McGinley,* 84 Md.App. 292, 297, 578 A.2d 840 (1990) (affirming jury instruction that "the burden of proof would be upon the plaintiff in this case to demonstrate to you what portion of the injury, if any, was aggravated by this incident as opposed to what was preexisting."). Another variant of the general rule, also illustrative, is the principle that, if a tortfeasor causes injury, and a physician negligently treats the injury, the plaintiff generally has the burden of proving the additional harm caused by the physician's negligence. *Morgan v. Cohen,* 309 Md. 304, 310, 523 A.2d 1003 (1987).

The injury in this case did not involve two distinct harms, such as an injury to two different parts of the body. A single injury or harm may be divisible or indivisible, however. Some injuries are inherently or obviously indivisible, *e.g.,* death or, generally, a traumatic injury to a particular part of the body. Restatement § 433A cmt. i. *See also Lahocki v. Contee Sand & Gravel Co.,* 41 Md.App. 579, 590–91, 398 A.2d 490 (1979), *rev'd* 286 Md. 714, 410 A.2d 1039 (1980) (broken back was an indivisible injury). The injury in this case was not inherently

or obviously indivisible and thus incapable of being apportioned. Assuming it was divisible, it was also not obviously severable into distinct parts without the benefit of evidence. Appellants' evidence was that any act of negligence before 9 p.m. caused the entire injury, and that any act of negligence after 9 p.m. caused less than the entire injury. Appellants made no showing that the injury could or could not be apportioned, and if so, how it should be apportioned. Assuming appellees had engaged in some unspecified conduct after 9 p.m. and further assuming, for present purposes, that the conduct was a negligent act(s), there was no evidence with respect to the effect of that act on the nature of the injury. There was also no evidence, as of any point in time after 9 p.m., describing the resultant injury in terms of level of functioning and the required amount of care or that it was not capable of such description.

Even if the court had denied appellees' motion and permitted the jury to find negligence after 9 p.m., absent evidence that the harm was divisible or that there was a reasonable means for dividing the harm according to the contribution of negligence after 9 p.m., there was no basis for a jury to calculate and award damages based on a negligent act(s) after 9 p.m.

 Appellants argue that enough evidence was produced to shift the burden of proof to appellees to show that the alleged negligent acts after 9 p.m. did **not** cause the entire injury or to show that for some other reason they would have been liable for less than the entire injury. We disagree. The Restatement § 433B(2) and (3) carves out limited exceptions to the general allocation of the burden of proof for causation. The Restatement provides that the burden of proving that the tortious conduct of a defendant caused the harm to the plaintiff is on the plaintiff except (1) where the tortious conduct of two or more parties has combined to harm the plaintiff and one or more of the parties seeks to limit liability by apportioning the damages among them, the burden of proof as to apportionment is on the negligent party or (2) where the

conduct of two or more parties is tortious and it is proved that the harm has been caused by only one of the parties, but it is uncertain as to which party, each party has the burden of proving it did not cause the harm. Restatement § 433B. With respect to a harm resulting from an aggravation of a preexisting injury or resulting from a negligent act following an innocent act, generally speaking, the burden of proving causation remains on the plaintiff. *Id.* § 433B(1). Section 433B does not place the burden of proof on a defendant to show divisibility of the harm or to limit the defendant's own liability in the absence of two or more tortfeasors. The acts before us relate solely to Dr. Jeffries' alleged negligent treatment.

Our research has disclosed cases that have been cited as authority for enlarging the exceptions and shifting the burden to a defendant to prove that a harm is capable of apportionment and to prove the actual apportionment between a negligent act, on the one hand, and an innocent cause or preexisting injury, on the other. *See Blatz v. Allina Health Sys.*, 622 N.W.2d 376, 390–91 (Minn.2001) (citing *Newbury v. Vogel*, 151 Colo. 520, 379 P.2d 811, 813 (1963); *Lovely v. Allstate Ins. Co.*, 658 A.2d 1091, 1092 (Me.1995); *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726, 730 (1996); *Bigley v. Craven*, 769 P.2d 892, 898 (Wyo.1989)); *Fosgate v. Corona*, 66 N.J. 268, 330 A.2d 355, 358 (1974) (citing *Matsumoto v. Kaku*, 52 Haw. 629, 484 P.2d 147 (1971); *Graham v. Roberts*, 142 U.S.App.D.C. 305, 441 F.2d 995 (1970); *Hylton v. Wade*, 29 Colo.App. 98, 478 P.2d 690 (1970); *Blaine v. Byers*, 91 Idaho 665, 429 P.2d 397 (1967); and *Newbury v. Vogel*, 151 Colo. 520, 379 P.2d 811 (1963)). Many of the cases cited made no mention of burden-shifting, however, but expressly dealt with jury instructions when the harm caused by a preexisting injury and aggravation was indivisible. *Accord* Restatement § 433A(2). This Court has cited *LaMoureaux v. Totem Ocean Trailer Express*, 632 P.2d 539 (Alaska 1981), and *McDonald v. United Airlines, Inc.*, 365 F.2d 593 (10th Cir.1966), for the proposition that the plaintiff must first show impossibility of apportionment before a court instructs a jury that it may award damages for the entire harm. *Seites*, 84 Md.App. at 299–300, 578 A.2d 840.

When discussing burdens of proof, courts often do not distinguish between the burden of production to get an issue to a jury versus the burden of persuasion.[5] For example, the *Fosgate* court held that the "burden of proof" should be shifted to the at-fault defendant, but gave no further explanation. *Fosgate*, 330 A.2d at 358. While the burden of persuasion may shift with respect to a particular issue, the burden of producing evidence to create a jury issue rarely shifts.

The question of whether a harm is capable of apportionment between two or more causes is for the court if it can be decided as a matter of law. Restatement § 434(1). If not, both the question whether a harm is capable of apportionment, and if so, actual apportionment, are questions for the factfinder. *Id.* § 434(2). In the case before us, we hold that appellants did not meet their threshold burden of production to get those issues to a jury, and thus we do not even reach the question of whether the burden of persuasion would shift if the issues were before a jury. We add, however, that we do not believe that the burden of persuasion would or should shift.[6]

Maryland courts generally adhere to traditional causation requirements and are reluctant to depart from those requirements, absent compelling reason for change. *See Fennell, supra*, 320 Md. at 786–87, 580 A.2d 206; *Weimer, supra*, 309 Md. at 552–53, 525 A.2d 643. This Court has applied the plain language of Restatement § 433B and refused to recognize the burden-shifting exceptions in cases involving a preexisting injury. *Seites*, 84 Md.App. at 300, 578 A.2d 840 (acknowledging that Restatement § 433B was a correct statement of the law and finding that burden-shifting did not apply).

---

**5.** See the excellent discussion of the two concepts by Judge Moylan in *Angelini v. Harford Co.*, 144 Md.App. 369, 798 A.2d 26 (2002) and *Starke v. Starke*, 134 Md.App. 663, 676–77, 761 A.2d 355 (2000).

**6.** This is not a case involving multiple tortfeasors. *See* Restatement § 433B.

We see a distinction between a harm caused by two or more negligent defendants and a harm with multiple causes but one defendant. In the former situation, the dispute is between the defendants, and in the latter situation, the dispute is between the plaintiff and the defendant. In the latter situation, we find no reason for deviating from the general rule as to burden of proof. *Accord Blatz v. Allina Health Sys.*, 622 N.W.2d 376 (Minn.App.2001) (finding no support in the Restatement for shifting burden to prove apportionment in preexisting injury case to at-fault defendant).

In a case where liability of the defendant has been assumed or established and addressing only the question of apportionment of damages, the relevant principles may be summarized as follows. Where there are two or more causes of harm, one defendant, and indivisibility is apparent, the court shall decide that apportionment is not appropriate. Restatement § 434(1). In that situation, the factfinder shall compensate the plaintiff for the entire harm. *Id.* § 433A(2). If there are two or more causes of harm, one defendant, and indivisibility is not apparent, the plaintiff has the burden of producing evidence to show that the harm is not divisible or, if it is, some evidence to show that a harm was produced by each cause and the nature of the harm. *Id.* §§ 433A(1) & 433B(1). If the plaintiff's evidence showing indivisibility is not capable of a reasonable conclusion to the contrary, assuming the defendant has not introduced conflicting evidence,[7] the court shall decide that the harm is not divisible. *Id.* § 434(1). In that situation, the factfinder shall compensate the plaintiff for the entire harm. *Id.* § 433A(2). Where the plaintiff's evidence is capable of different conclusions, the plaintiff has the burden of persuasion with respect to indivisibility or, if it is divisible, as to the extent of the harm caused by the negligent act. *Id.* §§ 433A(1) & 433B(1). If the plaintiff's evidence is capable of different conclusions, the factfinder shall determine if the harm is capable of apportionment and, if so, apportion damages. *Id.*

---

7. A defendant is free to put on evidence that the harm is divisible and how it should be divided.

§ 434(2). If the factfinder determines the harm was not capable of apportionment, the factfinder shall compensate the plaintiff for the entire harm. *Id.* § 433A(2).

In this case, the question of whether the harm was indivisible was not apparent. Appellants acknowledged the ***absence*** of evidence with respect to the harm caused by negligent acts after 9 p.m., not the ***impossibility*** of producing such evidence. Appellants presented no evidence that the harm was indivisible. As a result, the court could not and did not rule as a matter of law that the harm was indivisible, which would have made appellees potentially liable for the entire harm, assuming that the only act of negligence occurred after 9 p.m. Similarly, appellants presented no evidence that the harm was divisible, and that a harm was caused by each subsequent negligent act. There was no evidence as to what the final resultant harm would have been or even whether it would have been any different, assuming no acts of negligence after 9 p.m. There was no evidence whatsoever comparing the harm, assuming no negligence prior to 9 p.m., with the harm, assuming acts of negligence after 9 p.m. Because appellants did not produce any evidence that the harm was divisible and the nature of the harm produced by each potential cause, the question of apportionment was properly not submitted to the jury.

For the reasons discussed above, we hold that the circuit court did not err in granting appellees' motion for partial judgment.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**