*Sonia Carter, et al. v. Wallace & Gale Asbestos Settlement Trust*, No. 84, September Term, 2013, Opinion by Greene, J.

**WRONGFUL DEATH – ASBESTOS LITIGATION – APPORTIONMENT OF DAMAGES**

In Maryland, apportionment of damages among different causes is only appropriate where the injury in question is reasonably divisible among multiple causes. Where the injury in question is death caused by lung cancer, and where there is a single tortfeasor involved in the litigation, apportionment of damages is inappropriate.

**WRONGFUL DEATH – JOINDER OF USE PLAINTIFFS – STATUTE OF LIMITATIONS**

Under the state of the law at the time of trial in the present case, which was prior to this Court's decision in *University of Maryland Medical Systems Corp. v. Muti*, 426 Md. 358, 44 A.3d 380 (2012) and prior to the amendments to Maryland Rule 15-1001 (effective January 1, 2013), designated use plaintiffs were considered real parties in interest that were not required to formally join in the proceeding in order to share in an award for damages. Absent any clear direction or requirement that formal joinder was necessary, a use plaintiff's knowing consent to the litigation on his or her behalf and active participation in the litigation was the functional equivalent of joinder. So long as knowing consent to, and active participation in, the litigation occurred prior to the expiration of the statute of limitations, a use plaintiff could maintain a claim for damages where there was no formal joinder.

Circuit Court for Baltimore City
Case No.: 24-X-09-000419
Argued Date: May 5, 2014

IN THE COURT OF APPEALS
OF MARYLAND

No. 84
September Term, 2013

---

SONIA CARTER, *et al.*

v.

THE WALLACE & GALE ASBESTOS
SETTLEMENT TRUST

---

Barbera, C.J.
Harrell
Battaglia
Greene
McDonald
Rodowsky, Lawrence F. (Retired, Specially
        Assigned),
Raker, Irma S. (Retired, Specially
        Assigned)

---

JJ.

---

Opinion by Greene, J.
Battaglia and Raker, JJ., concur and dissent.

Filed: July 21, 2014

In the present case, we are called to decide whether apportionment of damages is appropriate in the wrongful death and asbestos litigation context, and whether the "use plaintiffs"[1] here are precluded from recovering damages by not formally joining in the proceedings. We reverse the judgment of the Court of Special Appeals and hold that the intermediate appellate court erred when it held that the trial court erroneously refused to allow expert testimony and jury instructions on apportionment of damages, and when it held that the failure of the use plaintiffs to formally join in the action before the statute of limitations had run precluded them from recovering damages.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. The Parties and Cases

This case is an appeal from judgments in favor of plaintiffs and use plaintiffs in four asbestos cases that were consolidated for trial in Baltimore City. All of the plaintiffs were separately awarded damages for their wrongful death claims against Wallace & Gale Asbestos Settlement Trust ("WGAST"). The four decedents who are the subject of these consolidated cases, Levester James ("James"), Mayso A. Lawrence Sr. ("Lawrence"), Rufus E. Carter ("Carter"), and Roger C. Hewitt, Sr. ("Hewitt"), all worked for various companies (most frequently at Bethlehem Steel and American Smelting and Refining Company) where

---

[1]A use plaintiff in common law pleadings is "[a] plaintiff for whom an action is brought in another's name," *Black's Law Dictionary* 1579 (8th ed. 2004), and "who does not join in the action," Md. Rule 15-1001(b). For purposes of this opinion, we use the term "use plaintiffs" for all plaintiffs whose names were preceded by the phrase "to the use of" in the complaints. We make this designation to differentiate between the original party plaintiffs and the original use plaintiffs and to avoid confusion when discussing the two classes.

Wallace & Gale, Co. ("W&G") installed asbestos-containing products. W&G was a Baltimore-based insulation and roofing contractor that was established in 1881.

W&G initially handled all asbestos claims filed against it until W&G filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on November 16, 1985. Thereafter, the United States Bankruptcy Court for the District of Maryland entered an order affirming the Fourth Amended Joint Plan of Reorganization. This created WGAST, an entity that assumed liability for asbestos claims against W&G. On November 2, 2010, the United States Bankruptcy Court for the District of Maryland approved the "Second Amended and Restated Asbestos BI Claims Resolution Procedures." In part, the procedures provided that claims may be brought against WGAST by either December 28, 2010, or the statute of limitations date, whichever is later. Based on the dates when the four complaints were amended to add wrongful death counts, the last dates to bring claims under this order were December 28, 2010 in the *Carter* and *James* cases, February 21, 2011 in the *Lawrence* case, and July 24, 2012 in the *Hewitt* case.

The *Carter* case

Carter worked as a laborer and crane operator at the Baltimore-based copper refinery American Smelting and Refining Company ("ASARCO") from 1966 to 1975. He was exposed to asbestos from insulation applied to pipes. Carter died from lung cancer in November 2003. On February 17, 2006, Johanna Carter, as personal representative of Carter's estate, and Sonia, Carter's surviving daughter, filed an amended short form

2

complaint against numerous defendants, claiming loss of consortium, negligence (survival), strict liability (survival), conspiracy, fraud, and wrongful death. The complaint listed Carter's other children as use plaintiffs: Kenneth, Rufus Jr., and Natasha. Thereafter, Sonia filed a Notice to Substitute Parties, advising that Johanna had been removed as personal representative and Sonia had been appointed as successor because Johanna's marriage to Carter had been previously annulled.

The *James* case

James was a laborer in ASARCO's tank room from 1968 to 1972, where he was exposed to asbestos in pipe insulation. James died from lung cancer on July 4, 2004, at age 70. On January 5, 2007, James's stepdaughter Willean Peoples, as personal representative of his estate, filed a short form asbestos complaint against numerous defendants, including WGAST, containing counts of negligence (survival), strict liability (survival), conspiracy, fraud, and wrongful death. James's children, Kevin and Monica, and his wife, Katherine, were named in the complaint as use plaintiffs.

The *Lawrence* case

Lawrence worked as a laborer at ASARCO from 1968 to 1969 and in Bethlehem Steel's "68-inch hot strip mill" at Sparrows Point from 1970 to 1979, where he was exposed to asbestos from pipe insulation. Lawrence died from lung cancer on October 8, 2007, at age 65. On February 21, 2008, Arthur L. Drager, as personal representative of Lawrence's estate and Bernice, Lawrence's widow, filed a short form asbestos complaint against numerous

3

defendants, including WGAST, alleging negligence (survival), strict liability (survival), conspiracy, fraud, and wrongful death. Lawrence's seven children, Mayso Jr., Tyrone, Cephas, Sean, Elaine, Phaedra, and Tanesha, were named in the complaint as use plaintiffs.

The *Hewitt* case

Hewitt worked as a laborer, mechanic steamfitter, and pipefitter at the Pennsylvania Railroad from 1943 to 1944, and as a laborer and crane operator at Bethlehem Steel from 1946 to 1978, where he was exposed to asbestos in pipe insulation supplied by W&G. Hewitt was a long-time smoker, smoking half a pack to a full pack of cigarettes every day for 65 years. He died as a result of complications from lung cancer on December 20, 2008, at age 81. On September 7, 2006, prior to his death, Hewitt and his wife, Annette, filed a short form asbestos complaint against numerous defendants, alleging that Hewitt had been diagnosed with asbestosis and asbestos-related diseases in April 2006. On January 5, 2007, plaintiffs filed an Amendment by interlineation, adding WGAST as a defendant. Following Hewitt's death, Roger Jr., Hewitt's son, filed a Notice to Substitute Parties, notifying the Circuit Court for Baltimore City and the parties that he, as personal representative of Hewitt's estate, was added as a party plaintiff in the survival action. On July 24, 2009, Annette and Roger Jr. filed an amended short form complaint, incorporating the counts set forth in the original complaint (loss of consortium, negligence (survival), strict liability (survival), conspiracy, and fraud) and added a count alleging wrongful death. Hewitt's daughters, Penny and Idalyn, were named in the amended complaint as use plaintiffs. Roger

4

Jr. also filed an "Amendment by Interlineation to Add Disease Process," alleging that Hewitt also suffered from lung cancer causally connected to his exposure to asbestos and asbestos products.

**B. The Proceedings Below**

On November 10, 2009, the Circuit Court for Baltimore City consolidated ten asbestos cases for trial, including the four at issue in this appeal. The trial was scheduled to begin on January 18, 2011. According to the scheduling order, plaintiffs were required to produce all fact witnesses for deposition by September 15, 2010, but this did not occur. Plaintiffs allege that it is typical of all asbestos cases tried in Baltimore City to defer all expert and family member depositions until the completion of settlement negotiations, and that this process was the reason for the delay in producing such fact witnesses. On January 3, 2011, WGAST filed two motions to exclude all fact and expert witnesses. The trial judge denied both motions and allowed settlement negotiations between all the parties to continue. Ultimately, settlements were entered into among all plaintiffs and defendants except for defendant WGAST. The trial judge thereafter held summary judgment motions hearings, granted summary judgment in four other plaintiffs' cases, and denied summary judgment in the four cases at bar. Following those hearings, the only remaining claims were against WGAST in the *Carter*, *James*, *Lawrence*, and *Hewitt* cases, which were consolidated for trial and are now at issue in this appeal.

On January 17, 2011, the day before the scheduled trial date, the trial judge directed

the plaintiffs to provide discovery and participate in depositions prior to the commencement of trial, which was continued to February 9, 2011. During that time, WGAST conducted thirty-one depositions, including depositions of experts, party plaintiffs, and individuals identified as use plaintiffs. A fifteen-day jury trial took place between February 9 and March 2, 2011, and the jury ultimately returned verdicts in favor of the plaintiffs, including those listed as use plaintiffs.

Apportionment in the *Hewitt* case

Hewitt worked at Bethlehem Steel for over thirty years and smoked half a pack to a pack of cigarettes a day. He was diagnosed with lung cancer in October 2008 and died two months later. During trial, Dr. Steven Zimmet testified that asbestos exposure was a substantial contributing factor to Hewitt's lung cancer and that smoking was also a cause of Hewitt's lung cancer. Dr. Zimmet further testified that he could not differentiate between the two causes because the two exposures are "not just additive, they are synergistic[2] which means they multiply exposures." WGAST admitted that Hewitt had asbestosis that contributed to his lung cancer and requested that the Circuit Court allow apportionment of the damages. Hewitt's counsel objected on the grounds that in Maryland, apportionment had never been applied in the asbestos litigation context and also, that apportionment was

---

[2] "Synergistic" is defined as "acting together; enhancing the effect of another force or agent." *The Sloane-Dorland Annotated Medical-Legal Dictionary* 698 (1987) (citing, *e.g.*, *Murphy v. Owens-Corning Fibreglas Corp.*, 447 F. Supp. 557, 571 (D. Kan. 1977) ("The entire theory of the plaintiff's case at trial was that the *synergistic* reaction of 'chemicals + heat + dust' produced the pulmonary disability for which relief was sought.")).

6

theoretically impossible in this situation. WGAST's counsel responded that there was a "strong foundation" for apportionment and that their expert, Dr. Gerald R. Kerby, would testify that apportionment of damages was appropriate here, based on epidemiological and other scientific studies. The trial judge expressed doubt concerning the viability of this theory, stating:

> No, I understand there is a statistical basis for likelihood of risk. But in a given – with a given plaintiff, I don't know how you can apportion it. But, you know, I guess, the witness can say what he says if he is qualified to say it. But I'm not going to give an instruction on this because it is not – I don't perceive it at this point to be the law in these types of cases.

> * * * *

> You can apportion risk. I don't know how, in an individual plaintiff['s] case, you can apportion damages. I don't know. It is a mystery to me. We'll find out. The doctor will show up and we will hear about it.

WGAST's counsel then filed an offer of proof concerning Dr. Kerby's testimony. It provided that Dr. Kerby was of the opinion that Hewitt's occupational exposure to asbestos as well as his history of cigarette smoking were both substantial contributing factors to the development of his lung cancer and resulting death. Moreover, the offer of proof stated that Dr. Kerby would further opine that the relative contribution of Hewitt's tobacco use and of Hewitt's exposure to asbestos to the development of his lung cancer was 75% and 25%, respectively. The trial judge accepted the offer of proof but excluded Dr. Kerby's testimony on apportionment of damages. Dr. Kerby was still permitted to testify as to the statistical likelihoods of disease from certain sources.

The Circuit Court judge also declined to give WGAST's requested jury instruction on

7

apportionment of damages, which read:

> If you decide that plaintiff suffered from an asbestos-related lung disease for which the defendant is responsible, and that plaintiff had a history of smoking and/or tobacco exposure, and that plaintiff's asbestos exposure and plaintiff's smoking history and/or tobacco exposure were both substantial contributing factors in the development of plaintiff's lung disease, then you shall apportion the damages between plaintiff's asbestos exposure and the plaintiff's smoking history/tobacco exposure. This apportionment of damages should be based on the percentage you believe each factor contributed to plaintiff's lung disease.

The trial judge stated in response:

> It is just not the law in these cases. But I understand the theory. Although it does strike me, with all due respect. It is kind of a very unscientific wild guess you're asking the jury to make. I mean, there is no real basis in the record, nor could there ever be.

The court also declined to distribute to the jury WGAST's proposed verdict sheets, which asked the jury to determine the percentage of compensatory damages that were related to Hewitt's cigarette smoking and to his asbestos exposure, and whether the jury could, by a preponderance of the evidence, apportion damages between the two different causes.

Use Plaintiffs

On December 20, 2010, prior to the commencement of trial, the plaintiffs filed their proposed voir dire. Question two asked the following regarding the plaintiffs: "Is any member of the panel or any member of your immediate family, or close circle of friends related to or otherwise acquainted with the plaintiffs" and then proceeded to list all 25 interested parties, including the decedents, party plaintiffs, and use plaintiffs. During opening statements, plaintiffs' counsel referred to the use plaintiffs as "family members" and

8

the four decedents as "plaintiffs."  Most of the use plaintiffs testified and were subject to cross-examination by WGAST's counsel.[3]

After plaintiffs concluded their case, WGAST filed a Motion for Directed Verdict, arguing that the statute of limitations had run and that, therefore, the use plaintiffs in the *James* and *Carter* cases were precluded from joining the action as required by Maryland Rule 15-1001.  In an oral motion for judgment "against all the plaintiffs' cases on all counts," WGAST's counsel argued that all use plaintiffs failed to join as necessary parties and that their identification in the complaint was only to provide them with notice of the action.  The court denied the motion for judgment with leave for WGAST's counsel to renew the motion at the conclusion of the presentation of all the evidence.  When WGAST's counsel renewed the motion at the close of all the evidence, the trial judge in effect denied the motion for judgment, reasoning:

> What is the harm of leaving them in, let them render a judgment, that way if it goes up on appeal and they happen to be right—it doesn't matter whether they are right, if they happen to convince several people that they are right, then there is no—they have to go back and retry the use plaintiffs. . . . If I decide [WGAST's counsel] is right, I just strike all the verdicts against the use plaintiffs and it goes up on appeal and they can deal with it however they choose to deal with it.

Verdicts and Judgments

The jury returned verdicts in favor of the plaintiffs and use plaintiffs in the following

---

[3] Twelve of the fifteen use plaintiffs were deposed and testified at trial.  The three that did not participate via deposition or testimony were unavailable at the time: two were incarcerated, and one was disabled and unable to hear.

amounts: (1) *Carter* case: $2,017,302.50; (2) *James* case: $2,035,684.71; (3) *Lawrence* case: $2,930,532.09; and (4) *Hewitt* case: $2,686,686.07.  On May 12, 2011, the Circuit Court entered orders in the four cases, reducing the jury verdicts after application of the cap on non-economic damages, bankruptcy settlement payments, and joint tortfeasor credit for appellant's cross-claims against another defendant (*i.e.,* pro rata share allocation).  The jury verdicts were reduced to the following judgments:

(1) The *Carter* case:

| | |
|---|---|
| Survival: | $499,953.41(total) |
| Wrongful Death: | $476,250.00 (total) |
| Plaintiff Sonia Carter: | $119,062.50 |
| Use Plaintiff Rufus Carter, Jr.: | $119,062.50 |
| Use Plaintiff Kenneth Carter: | $119,062.50 |
| Use Plaintiff Natasha Sloan: | $119,062.50 |
| **Total Judgment:** | **$976,203.41** |

(2) The *James* case:

| | |
|---|---|
| Survival: | $503,959.39 (total) |
| Wrongful Death: | $476,250.50 (total) |
| Use Plaintiff Katherine James: | $238,125.50 |
| Use Plaintiff Monica James: | $119,062.50 |
| Use Plaintiff Kevin James: | $119,062.50 |
| **Total Judgment:** | **$980,209.89** |

(3) The *Lawrence* case:

| | |
|---|---|
| Survival: | $261,371.24 (total) |
| Wrongful Death: | $521,250.00 (total) |
| Plaintiff Bernice Lawrence: | $108,593.74 |
| Use Plaintiff Elaine McPherson: | $32,578.13 |
| Use Plaintiff Mayso Lawrence, Jr.: | $32,578.13 |
| Use Plaintiff Phaedra Bailey: | $32,578.13 |
| Use Plaintiff Tyrone Lawrence: | $32,578.13 |
| Use Plaintiff Cephus Lawrence: | $32,578.13 |
| Use Plaintiff Sean Lawrence: | $32,578.13 |
| Use Plaintiff Tanesha Lawrence: | $32,578.13 |

| | |
|---|---|
| **Total Judgment:** | **$782,621.24** |

(4) The *Hewitt* case:

| | |
|---|---|
| Survival: | $687,394.00 (total) |
| Loss of Consortium: | $169,050.97 (total) |
| Wrongful Death: | $469,050.98 (total) |
| Plaintiff Annette Hewitt: | $172,808.26 |
| Plaintiff Roger C. Hewitt, Jr.: | $98,747.57 |
| Use Plaintiff Idalyn Williams: | $98,747.57 |
| Use Plaintiff Penny Hewitt: | $98,747.57 |
| **Total Judgment:** | **$1,325,495.95** |

Post-Trial Proceedings

Following the Circuit Court's rendering of recorded judgments, WGAST's counsel filed a Motion for Judgment Notwithstanding the Verdict, a Motion for New Trial, and a Motion for a Remittitur (the "post-trial motion hearing"), again raising the issues of apportionment in the *Hewitt* case and the status of the use plaintiffs in all cases. The court held a hearing on the post-trial motion on July 21, 2011. After hearing arguments from both sides, the trial judge ruled from the bench on the apportionment issue, stating:

> All right. I'm going to deny. I find it a fascinating argument. I'm going to deny it. It will be preserved for appeal, if you can convince the Court of Special Appeals/Court of Appeals with this. It's a fascinating argument.
>
> I just have no idea how—we're already putting on the jury's shoulders and into their heads material that, sitting here listening to these cases, I have listened to how many, eight or ten or how many I've heard is really—approaches the unknowable to start with. And then you start having them divide up and apportion different levels of the unknowable among different parties. It's just too much.
>
> It's a fascinating issue. I think that if the legislature wanted to pass a bill saying in all cases where there's smoking and there's asbestos inhalation, we'll divide the liability in the following fashion based upon epidemiological

studies, I guess they could do that.

If the Court of Appeals wants to send us down that path to another swamp, I suppose we could do that. It's an interesting issue. Technologically, it's interesting. But we don't have any basis for drawing an intelligent conclusion regarding what we're going to plug into the matrix. So no, we're not doing that.

As to the issue of joinder of the use plaintiffs, following arguments from both parties, the trial judge stated that he was going to delay his decision on "this mess with the use plaintiffs." On October 13, 2011, the Circuit Court held a brief hearing on this sole outstanding issue, where the trial judge decided that "there is no question that use plaintiffs have to be included. They're supposed to be included. They're necessary parties." He further opined:

Honestly, I don't know what the right answer is. But I'm going to rule in favor of the plaintiffs on this and get this on to appeal by allowing the verdicts, although I have serious qualms, quite frankly, in my own mind as to how you can throw someone in.

I did it, admittedly. I did it, so I might as well deal with the consequences of it. I did it sort of as a safety device, and I don't think the law is particularly clear.

The issue clearly is defined in my mind as does a use plaintiff who otherwise didn't appear until the trial and never got moved into the case until it was ready for verdict, are they entitled to have a verdict entered in their name? Or are they simply entitled to share in whatever verdict is taken in the name of the plaintiffs in the case.

Common sense tells me that if you're a use plaintiff, you shouldn't—I shouldn't have put them on the verdict sheet. But the [C]ourt of [A]ppeals decision—I don't think it really clears the issue up.

But since I put them on the verdict sheet, I'll stick with that. And we'll allow

12

the verdict to stand with respect to that and overrule motions, although I think honestly it is very dubious. I'm doing the best I can with what I have because I did it. Whatever mess we have, I created by not dealing with that up front. So, I'll allow it to stand. And it will go on appeal. And it will work out itself.

As predicted by the trial judge, WGAST noted a timely appeal. In a reported opinion, the Court of Special Appeals held in pertinent part that (1) the failure of the use plaintiffs to join the action as party plaintiffs before the expiration of the wrongful death three year limitations period precluded the use plaintiffs from recovering damages; and (2) the Circuit Court erred when it refused to instruct the jury as to apportionment of damages and when it excluded expert's testimony on apportionment. *Wallace & Gale Asbestos Settlement Trust v. Carter*, 211 Md. App. 488, 65 A.3d 749 (2013). This Court granted *certiorari*, *Carter v. Wallace & Gale Asbestos Settlement Trust*, 434 Md. 311, 75 A.3d 31 (2013), to address the following questions:

(1) Whether the Court of Special Appeals erred in its conclusion that the Circuit Court did not analyze the opinion of WGAST's expert and erred in refusing to instruct the jury on apportionment of damages; and

(2) Whether the Court of Special Appeals erred in its conclusion that the use plaintiffs were required to formally join the action with a formal pleading and are now barred by the Statute of Limitations.

## II. DISCUSSION

In the instant matter and pertinent to the issues on appeal, the Court of Special Appeals held that (1) as to the *Hewitt* case, the trial judge erred when he rejected the argument of allocation of damages according to the respective harm caused by smoking and exposure to asbestos; and (2) as to all four consolidated cases, the trial judge also erred in

13

allowing substantial damage awards to use plaintiffs who never joined in the action prior to the verdict.

As to the first issue, the Court of Special Appeals concluded that apportionment of damages between several causes of an injury is appropriate in some circumstances, relying in large part on the Superior Court of New Jersey's opinion in *Dafler v. Raymark Industries, Inc.*, 611 A.2d 136 (N.J. Super. Ct. App. Div. 1992). At issue in *Dafler* was whether damages for plaintiff's lung cancer could be apportioned between an asbestos producer defendant and the cigarette smoker plaintiff. The court held that there was reasonable factual support for the jury's finding that 70% of plaintiff's lung cancer was caused by cigarette smoking and 30% was caused by his exposure to asbestos. *Dafler*, 611 A.2d at 145-46.

*Dafler* is not binding on this Court. The Court of Special Appeals acknowledged this, but it also did not appreciate that New Jersey law is grounded in comparative negligence principles (whereas Maryland law is grounded in contributory negligence principles). Although the Court of Special Appeals attempted to dispel this major difference in the two states' tort laws by stating that the New Jersey Superior Court's decision in *Dafler* was not based in comparative negligence principles, we disagree. The New Jersey opinion makes this point for us: "As we well know, apportionment is also consistent with the principles of the Comparative Negligence Act." *Dafler*, 611 A.2d at 145. The New Jersey appellate court affirmed the jury's finding that the plaintiff was 70% at fault for his injuries (again, a finding firmly rooted in comparative negligence). 611 A.2d at 146. If the jury concluded similarly

14

in the case before us, Hewitt would be barred from receiving any damages under Maryland's

contributory negligence doctrine.[4]

We disagree with the Court of Special Appeals's reliance on New Jersey case law and

prefer to be guided by our own case law and principles previously relied upon by this state's

appellate courts. In a situation such as this, we shall hold that apportionment of damages is

appropriate only where the injury is reasonably divisible and where there are two or more

causes of the injury. We explain this conclusion in detail below.

As to the question of whether the use plaintiffs were formally required to join in this

case, the intermediate appellate court concluded that the use plaintiffs were not converted to

party plaintiffs simply because they were occasionally identified as "plaintiffs," they

participated in pretrial depositions, and they testified at trial. *Carter*, 211 Md. App. at 528,

65 A.3d at 773. Further, the court stated that because the use plaintiffs did not formally join

the action by filing some type of pleading and did not timely move to join the action, all use

plaintiffs were barred from doing so as the statute of limitations in each of the cases had

expired. *Id*. Based on the later date of either December 28, 2010, or the date when the

complaints were amended to add wrongful death counts,[5] the last dates for asserting claims

_____

[4] We note that WGAST did not argue that Hewitt was contributorily negligent in causing his death because of smoking. In fact, at oral argument Respondent's counsel acknowledged that they could not argue contributory negligence under these facts.

[5] This direction for deciding the statute of limitations date for claims against WGAST was prescribed by the "Second Amended and Restated Asbestos BI Claims Resolution Procedures" as approved by the United States Bankruptcy Court for the District of Maryland
(continued...)

15

against WGAST were December 28, 2010 in the *Carter* and *James* cases, February 21, 2011

in the *Lawrence* case, and July 24, 2012 in the *Hewitt* case. *See Carter*, 211 Md. App. at

529-30, 65 A.3d at 774. The Court of Special Appeals further held that the relation back

doctrine did not apply in this case because the use plaintiffs would be bringing new causes

of action and would increase the overall amount of damages sought. *Carter*, 211 Md. App.

at 530, 65 A.3d at 774.

Again, we disagree with the intermediate appellate court in this regard. Notably, at

the times of the filing of the amended complaints and subsequent trial in the present case,

Md. Rule 15-1001[6] did not require formal joinder[7] by the designated use plaintiffs in a

---

(...continued)
in November 2010.

[6]At the time of trial in the present case, in regard to a use plaintiff, Rule 15-1001 only prescribed that "[t]he words 'to the use of' shall precede the name of any person named as a plaintiff who does not join in the action," and included a requirement that the use plaintiffs be notified of the action. Effective January 1, 2013, the Court of Appeals amended Rule 15-1001 to include a requirement that all individuals, including use plaintiffs, formally join in the proceeding in order to become a party. We explain this change in greater detail below but emphasize that this distinction is the basis of our holding here.

[7] Joinder is "[t]he uniting of parties or claims in a single lawsuit." *Black's Law Dictionary* 853 (8th ed. 2004). Joinder is required in some instances to ensure that complete relief is given in a single action and that an absent person's interests in the litigation are protected. Paul V. Niemeyer & Linda M. Schuett, Maryland Rules Commentary 140 (2003). The purpose behind the joinder of parties rules is "to simplify and expedite proceedings and to avoid the useless duplication, expense and possible uncertainty of more than one trial." *Allen & Wahlen, Inc. v. John C. Grimberg Co.*, 229 Md. 585, 588, 185 A.2d 337, 339 (1962). In this situation, "formal joinder" is achieved by "fil[ing] a complaint or motion to intervene." Md. Rule 15-1001 (effective January 1, 2013).

wrongful death action. Absent any clear direction or requirement that formal joinder was necessary, on the facts of this case, the use plaintiffs' knowing consent to the litigation brought on their behalf and active participation in the litigation was the functional equivalent of joinder. We explain our reasoning for this conclusion below and reverse the judgment of the Court of Special Appeals as to both issues before us.

## A. Apportionment of Damages

Following a determination that a defendant's conduct was a substantial factor in causing injury to a plaintiff,[8] the fact finder must then determine an appropriate award of money damages. "The basic principle underlying the award of damages is that they are to compensate the aggrieved party." Rosalyn B. Bell, Maryland Civil Jury Instructions and Commentary § 18.02 (1993) (citing *Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 666, 464 A.2d 1020, 1026 (1983)). "The Maryland cases are in accord with the prevailing rule elsewhere: that if compensatory damages are to be recovered, they must be proved with

---

[8] Restatement (Second) of Torts § 433 sets forth the important considerations for determining whether a specific cause is a substantial factor in producing harm to another. It states:

> The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:
>     (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>     (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
>     (c) lapse of time.

17

reasonable certainty, and may not be based on speculation or conjecture[.]" *Asibem Assoc., Ltd. v. Rill*, 264 Md. 272, 276, 286 A.2d 160, 162 (1972).

A question may arise as to whether only a portion of the total damage award may properly be assigned to the defendant. This is the inquiry at bar. "The question is primarily not one of the fact of causation, but of the feasibility and practical convenience of splitting up the total harm into separate parts which may be attributed to each of two or more causes." W. Page Keeton et al., *Prosser and Keeton on Torts* § 52, at 345 (5th ed. 1984). Based on our review of Maryland case law and its application of the Restatement (Second) of Torts, we conclude that apportionment of damages is appropriate only where the injury in question is reasonably divisible among multiple causes.[9] As a matter of law, in the case at bar, the resulting injury is not reasonably divisible. Therefore, we reverse the judgment of the Court of Special Appeals.

In 2002, the Court of Special Appeals adopted the Restatement (Second) of Torts § 433A. Section 433A specifies the circumstances when apportionment of damages is appropriate. *See Mayer v. N. Arundel Hosp. Assoc.*, 145 Md. App. 235, 249, 802 A.2d 483, 491 (2002). Restatement (Second) of Torts § 433A states that:

(1) Damages for harm are to be apportioned among two or more causes where
    (a) there are distinct harms, or
    (b) there is a reasonable basis for determining the contribution of each

---

[9] We note that apportioning a lump sum settlement amount among multiple plaintiffs is a different situation entirely and is not subject to this analysis. The current situation involves apportioning damages among different causes, not plaintiffs.

18

cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes.

In other words, apportionment of damages is appropriate where the injury is divisible.

*Prosser and Keeton on Torts* illustrates the difference between a divisible and indivisible injury:

> The distinction is one between injuries which are reasonably capable of being separated and injuries which are not. If two defendants, struggling for a single gun, succeed in shooting the plaintiff, there is no reasonable basis for dividing the injury between them, and each will be liable for all of it. If they shoot the plaintiff independently, with separate guns, and the plaintiff dies from the effect of both wounds, there can still be no division, for death cannot be divided or apportioned except by an arbitrary rule devised for that purpose. If they merely inflict separate wounds, and the plaintiff survives, a basis for division exists, because it is possible to regard the two wounds as separate injuries; and the same of course is true for wounds negligently inflicted. . . . Upon the same basis, if two defendants each pollute a stream with oil, in some instances it may be possible to say that each has interfered to a separate extent with the plaintiff's rights in the water, and to make some division of the damages. It is not possible if the oil is ignited, and burns the plaintiff's barn.

§ 52, at 345-46 (5th ed. 1984) (citations omitted).

The concept of joint and several liability is helpful to explain further why a defendant should be held liable for the entirety of an injury, even when there may be multiple contributing causes. The analysis below is based on a concurrent tortfeasor situation, where a tortfeasor acts independently from–and concurrently with–other individuals to produce an indivisible injury to a plaintiff. *See Consumer Prot. Div. v. Morgan*, 387 Md. 125, 181-82, 874 A.2d 919, 952 (2005) (explaining the difference between tortfeasors acting in concert and concurrent tortfeasors as they relate to joint and several liability); *Morgan v. Cohen*, 309

19

Md. 304, 311-12, 523 A.2d 1003, 1006 (1986) (explaining the concept of concurrent

tortfeasors and how they relate to the common law concept of "joint tortfeasors"). If a

tobacco company could have been joined as a joint tortfeasor in this litigation, we could

have had a concurrent tortfeasor scenario. In *Consumer Protection Division v. Morgan*, this

Court explained:

> [T]he predicate for concurrent tortfeasors' joint and several liability is the indivisibility of the injury. We have long recognized that when tortfeasors act independently and their acts combine to cause a single harm, the tortfeasors are jointly and severally liable. . . . Under the 'single indivisible injury rule' or 'single injury rule,' the necessary condition for concurrent tortfeasors to be held jointly and severally liable is that they caused a single injury incapable of apportionment.

387 Md. at 178-79, 874 A.2d at 950-51 (citing *Cohen*, 309 Md. at 316, 523 A.2d at 1008;

*Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260, 99 S. Ct. 2753, 2756,

61 L. Ed. 2d 521, 527 (1979); *Mitchell v. Gilson*, 211 S.E.2d 744, 745 (Ga. 1975); *Ruud v.*

*Grimm*, 110 N.W.2d 321, 324 (Iowa 1961); *Palleschi v. Palleschi*, 704 A.2d 383, 385 n.3

(Me. 1998); *D & W Jones, Inc. v. Collier*, 372 So.2d 288, 294 (Miss. 1979); *Azure v. City*

*of Billings*, 596 P.2d 460, 469-71 (Mont. 1979); *Landers v. E. Tex. Salt Water Disposal Co.*,

248 S.W.2d 731, 734 (Tex. 1952); Restatement (Second) of Torts § 879). In a Supreme

Court of Montana opinion, cited above in *Morgan*, the Montana Court explained that

"[n]ondivisibility can result either because the harm caused cannot theoretically be divided

or because plaintiff cannot practically divide it among wrongdoers." *Azure*, 596 P.2d at 470

(citing Harper & James, Law of Torts, § 10.1 701-02 (1956)). An example of a theoretically

20

indivisible injury would be death or the destruction of a building. *Id.*

This Court, in *Morgan,* continued:

Rather, an independent, concurring tortfeasor is held jointly and severally liable because the plaintiff's injury cannot be divided into separate portions, and because the tortfeasor fulfills the standard elements of tort liability, *i.e.*, his or her tortious conduct was [a substantial factor in causing] the plaintiff's injury. The fact that another individual also tortiously contributes to the plaintiff's injury does not alter the independent, concurring tortfeasor's responsibility for the entirety of the injury which he or she actually and proximately caused.

*Morgan*, 387 Md. at 182, 874 A.2d at 952 (quoting *Woods v. Cole*, 693 N.E.2d 333, 336-37 (Ill. 1998)).

In this same vein, we look to the United States Supreme Court for guidance. In a maritime tort law case where the plaintiff longshoreman, the defendant shipowner, and the non-party stevedore were all negligent actors, the Court relied on the common law to support the position that "an injured party [is allowed] to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, even if the concurrent negligence of others contributed to the incident." *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260, 99 S. Ct. 2753, 2757, 761 L. Ed. 2d 521, 527 (1979). The situation in *Edmonds* can be analogized to the present case: plaintiff Hewitt added to his injury by smoking cigarettes, defendant WGAST substantially contributed to the harm, and an unidentified non-party cigarette company also contributed to Hewitt's injury. Plaintiff Hewitt, under the common law, is allowed to sue WGAST for the full amount of damages for an indivisible injury that WGAST was a substantial factor in

21

causing, even if a cigarette company's negligence contributed to the harm.

To be sure, if an injury is indivisible, any tortfeasor joined in the litigation whose conduct was a substantial factor in causing the plaintiff's injury would be legally responsible for the entirety of the plaintiff's damages. Only if the harm is reasonably divisible is the issue of apportionment a question of fact for the jury or a basis for a *Frye-Reed*[10] hearing. In that instance, where an injury is reasonably–or theoretically–divisible, the burden of proof would shift to the defendant to prove that apportionment of damages is appropriate. *See Azure*, 596 P.2d at 471 ("[W]here the harm caused is theoretically divisible, plaintiff's burden is to make a prima facie showing that the harm caused was at least a contributing proximate result of the defendant's act or omission. The burden then shifts to the defendant

_____

[10] Respondents contend that the trial judge should have at least conducted a *Frye-Reed* hearing before excluding Dr. Kerby's testimony. A *Frye-Reed* hearing is conducted in Maryland courts to determine whether expert testimony is admissible. "The name is derived from two cases, *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), where the standard of general acceptance in the relevant scientific community was first articulated, and *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978), where we adopted the *Frye* standard." *Blackwell v. Wyeth*, 408 Md. 575, 577 n.1, 971 A.2d 235, 236 n.1 (2009). "That is to say, before a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field." *Reed*, 283 Md. at 381, 391 A.2d at 368. This hearing would only be appropriate if apportionment of damages was proper as a matter of law, which the trial judge acknowledged that in this instance, it was not. In other words, had Hewitt's injury not been indivisible as a matter of law, *i.e.,* had Hewitt's ultimate injury not been death, the trial judge could have elected to conduct a *Frye-Reed* hearing based on Dr. Kerby's testimony concerning "the relative contributions" of Hewitt's cigarette smoking and asbestos exposure to the development of his lung cancer. We also note that during trial, it was only plaintiffs' counsel, not WGAST's, that requested a *Frye-Reed* hearing (and only in the instance that the trial judge accepted Dr. Kerby's apportionment testimony, which the trial judge did not).

to either deny all liability or to prove that the harm caused can be divided and the damages therefore apportioned.")

We therefore turn to the issue at hand: whether Hewitt's death from lung cancer was an indivisible injury. First, we note that the Court of Special Appeals has held previously that "[a] single injury or harm may be divisible or indivisible . . . . Some injuries are inherently or obviously indivisible, *e.g.*, death or, generally, a traumatic injury to a particular part of the body." *Mayer*, 145 Md. App. at 250, 802 A.2d at 492; *see also* Restatement (Second) of Torts § 433A cmt. i ("Certain kinds of harm, by their very nature, are normally incapable of any logical, reasonable, or practical division. Death is that kind of harm, since it is impossible, except upon a purely arbitrary basis for the purpose of accomplishing the result, to say that one man has caused half of it and another the rest."); W. Page Keeton et al., *Prosser and Keeton on Torts* § 52, at 347 (5th ed. 1984) ("Certain results, by their very nature, are obviously incapable of any reasonable or practical division. Death is such a result, and so is a broken leg or any single wound, the destruction of a house by fire, or the sinking of a barge."); *Azure*, 596 P.2d at 470 (concluding that death would make the ultimate harm theoretically indivisible). Although we consider these propositions to be conclusive, we need not rely on these statements alone to support the holding that Hewitt's harm was indivisible. We look, therefore, to the nature of the harm to determine if it was actually indivisible, as Hewitt's beneficiaries claim.

Plaintiffs rely on the fact that asbestos exposure and smoking have a synergistic effect,

23

which makes the harm indivisible.  At trial, Dr. Zimmet, an expert witness for Hewitt, testified as to what synergy is in this context:

> If an individual is a non-smoker and has not been exposed to asbestos, that person has a risk factor of getting lung cancer.  There are occasional things that happen without either of those exposures.
>
> If you have lung cancer – if you are a smoker, your lung cancer risk goes way up.  And if you are an asbestos-exposed individual, non-smoker, it goes way up.  But if you are a smoking asbestos worker, the risk factors are not really additive.  They are synergistic and they are multiple.  And the risk factors can go up, some published reports, 50 to 90 times if you both smoke and have asbestos exposure.

Commentators also indicate that

> asbestos and tobacco smoke are complex carcinogens that can affect multiple steps in the multistage process of cancer evolution, and that the combined effects will depend on the relative magnitude of each carcinogen at each stage. As reported in different studies, the interactive effect ranges from less than additive to supramultiplicative, but the model for insulation workers approximates a multiplicative effect. If the multistage model of carcinogenesis holds, and asbestos and smoking act at different stages, then a multiplicative relationship follows.

George A. Peters & Barbara J. Peters, Asbestos Pathogenesis and Litigation, Vol. 13 of the Sourcebook on Asbestos Diseases: Medical, Legal, and Technical Aspects 149 (1996). What we take from that language is that while there are many variables that go into the causal effects of tobacco and asbestos exposure, there is evidence that the effect is multiplicative in nature, which we are satisfied is indicative of an indivisible injury.

Based on the evidence presented at trial, there was sufficient evidence for the trial judge to conclude that Hewitt's death caused by lung cancer was an indivisible injury,

24

incapable of apportionment. WGAST admitted that Hewitt had asbestosis, which contributed

to his lung cancer and subsequent death.  Although witnesses on both sides testified that

Hewitt's smoking and exposure to asbestos were both factors in causing the harm to him,

what we are focused on here is the ultimate harmful result of WGAST's conduct, namely,

Hewitt's death.  Our intermediate appellate court, courts in other states, and leading

commentators Prosser & Keeton conclude, as we do, that death is an indivisible injury

incapable of apportionment.[11]

Last year, this Court revisited the question of whether Maryland should judicially

abrogate the common law principle of contributory negligence in favor of the more popular

comparative negligence doctrine.  *Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 69

A.3d 1149 (2013).  While this Court declined to do so, we find language in the dissenting

opinion, which argues for the adoption of comparative negligence, enlightening.  Writing for

the dissent, Judge Harrell explained that "a system of comparative negligence [is one] which

---

[11] Because no reasonable basis for dividing the injury between the plaintiff and the defendant exists, the more appropriate rule applicable to the award of damages in this case would be what is colloquially known as the eggshell plaintiff rule.  This principle is premised on the notion that "[t]he fact that the plaintiff's condition made him peculiarly susceptible to . . . injury . . . would not excuse the defendant from the consequences of [his] wrong." *Coca Cola Bottling Works, Inc. v. Catron*, 186 Md. 156, 161, 46 A.2d 303, 305 (1946).  "In other words, the fact that the injury would have been less serious if inflicted upon another person should not affect the amount of damages to which the plaintiff may be entitled." MPJI-Cv 10:3.  Here, Defendant WGAST "must accept the frailties with which the plaintiff [was] afflicted," *Peterson v. Goodyear Tire & Rubber Co.*, 254 Md. 137, 142, 254 A.2d 198, 201 (1969), namely, that Hewitt was a longtime cigarette smoker.  The fact that Hewitt was more susceptible to lung cancer than a non-smoker would be does not affect the amount of damages he is entitled to receive from WGAST.

25

apportions damages between a negligent plaintiff and a negligent defendant according to each party's relative degree of fault. Thus, under a comparative negligence system, a plaintiff's contributory negligence does not bar recovery, but rather reduces proportionately his or her damages in relation to his or her degree of fault." *Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 699, 69 A.3d 1149, 1160-61 (2013) (Harrell, J., dissenting).

This is precisely what WGAST is proposing we do here. Practically speaking, because there is no other tortfeasor joined in the case, WGAST hopes to apportion 75% to 90% of the damages to the plaintiff on the basis of Hewitt's smoking history and/or tobacco exposure. That outcome is in no way supported by Maryland law. WGAST's intent is evident by the language in its proposed jury instruction, which the trial judge rejected: "If you decide . . . that plaintiff's asbestos exposure and plaintiff's smoking history and/or tobacco exposure were both substantial contributing factors in the development of plaintiff's lung disease, then you shall apportion the damages between plaintiff's asbestos exposure and the plaintiff's smoking history/tobacco exposure." To apportion damages to "the plaintiff's smoking history/tobacco exposure," in our view, is to apportion damages between the plaintiff and the defendant, which is to hold the plaintiff accountable under comparative negligence principles.[12]

---

[12] This Court has rejected the comparative fault standard on numerous occasions, dating back to 1874. *See, e.g., Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 69 A.3d 1149 (2013); *Harrison v. Montgomery Cty. Bd. of Educ.*, 295 Md. 442, 456 A.2d 894 (1983); *Pittsburg & Connellsville R.R. Co. v. Andrews*, 39 Md. 329, 351, 17 Am. Rep. 568 (1874).

We further conclude that the Court of Special Appeals's contention that its holding (in support of apportionment of damages) is based on causation principles, rather than comparative negligence, and therefore sound in Maryland law, is not persuasive. The intermediate appellate court stated:

> [T]he issue of apportionment concerns causation, not comparative negligence as appellees urge this Court to determine. Comparative fault or comparative negligence involves [a] determination of the relative percentages of fault between joint tortfeasors—*i.e.* in a negligence action, comparative negligence involves looking at the respective duties and breaches of the joint tortfeasors. Such a system necessarily requires that a jury consider the actions of the joint tortfeasors leading up to the injury to determine whether both were at fault and, if so, how much of the fault each joint tortfeasor should shoulder. Maryland has explicitly rejected adopting comparative fault or comparative negligence in favor of maintaining contributory negligence.

*Carter*, 211 Md. App. at 537, 65 A.3d at 778-79. Stating that "[c]omparative fault or comparative negligence involves a determination of the relative percentages of fault between joint tortfeasors," *id.*, ignores the most simple form of comparative negligence, "which apportions damages between a negligent plaintiff and a negligent defendant according to each party's relative degree of fault," *Coleman*, 432 Md. at 699, 69 A.3d at 1160 (Harrell, J., dissenting). Comparative negligence not only allocates fault between tortfeasors, but allocates fault between plaintiffs and defendants, as would be the situation here. Again, allocation of fault between plaintiffs and defendants is contrary to this state's longstanding principles of contributory negligence.

Because Hewitt's injury was indivisible as a matter of law and WGAST was attempting to attribute a portion of the damages to the plaintiff for his smoking

27

history/tobacco exposure, we conclude that the trial judge did not abuse his discretion by excluding Dr. Kerby's testimony concerning apportionment of damages. To admit into evidence Dr. Kerby's testimony with regard to apportionment of damages would have been inconsistent with Maryland law. We also point out that in *Mayer*, the intermediate appellate court adopted the Restatement (Second) of Torts §434, which states in pertinent part that "[i]t is the function of the court to determine . . . (b) whether the harm to the plaintiff is capable of apportionment among two or more causes; and (c) the questions of causation and apportionment, in any case in which the jury may not reasonably differ." *See* 145 Md. App. at 253-54, 802 A.2d at 493-94 ("The question of whether a harm is capable of apportionment between two or more causes is for the court if it can be decided as a matter of law. If not, both the question[s of] whether a harm is capable of apportionment, and if so, actual apportionment, are questions for the factfinder.").

In the present case, the trial judge carefully considered whether the harm was capable of apportionment prior to deciding to exclude Dr. Kerby's testimony on the matter. During a lengthy discussion of the viability of the apportionment of damages issue at trial, the trial judge stated that it is not the law to apportion damages between smoking and asbestos inhalation, and later asked: "How can you possibly apportion these damages? It is a wild guess." At a motions hearing following the trial, the trial judge further explained his reservations concerning Dr. Kerby's testimony:

> The expert testimony is fairly implausible to start with, because they don't really – they're not actually able to, at a biological level, explain the specific

causes of specific diseases. It's just unknowable. So they say whatever they say.

* * * *

I can imagine creating a giant matrix that deals with all the potential risks from various levels of smoking and levels of exposure. But you're never going to know – you're never going to know – it's going to be all variables. You're not ever going to know any of the numbers you have fit into the equation, because you can't really tell how much the depth and level of exposure really was.

* * * *

And then you start having them divide up and apportion different levels of the unknowable among different parties. It's just too much.

Because the trial judge, through careful consideration, determined that Hewitt's death was incapable of apportionment, he did not abuse his discretion in determining that, as a matter of law, Dr. Kerby's testimony as it related to apportionment of damages was not admissible.

**B. Use Plaintiffs**

The second issue before this Court is whether the use plaintiffs are precluded from recovering damages because they did not formally join the wrongful death proceedings, and as a result are barred from doing so by the statute of limitations. To understand the genesis of the "use plaintiff" in this context, we first look to the history of the wrongful death statute. At the outset, "[t]he common law not only denied a tort recovery for injury once the tort victim had died, it also refused to recognize any new and independent cause of action in the victim's dependents or heirs for their own loss at his [or her] death." *Walker v. Essex*, 318 Md. 516, 522, 569 A.2d 645, 648 (1990) (quoting W. Page Keeton et al., *Prosser and Keeton on Torts* § 127, at 945 (5th ed. 1984)). In 1846, to counter this harsh rule, the English legislature created a cause of action for wrongful death, known as Lord Campbell's Act,

29

which required a wrongful death suit to be brought by the executor or administrator of the estate for the use of the parties named in the complaint. *Walker*, 318 Md. at 522-23, 569 A.2d at 468. The purpose of Lord Campbell's Act was "to compensate the *families* of persons killed by the wrongful act, neglect, or default of another person[,]" and the measure of damages was based on the loss sustained by the parties on whose behalf the action was brought. *Stewart v. United Elec. Light & Power Co.*, 104 Md. 332, 343, 65 A. 49, 53 (1906). Subsequently, every American state adopted its own wrongful death statute, with many states requiring the suit to be brought by the executor, administrator, or personal representative of the deceased person's estate. *Walker*, 318 Md. at 522-23, 569 A.2d at 648.

In 1852, Maryland adopted its wrongful death statute that had a close resemblance to Lord Campbell's Act. *Id.* Today, the key difference between the English statute and Maryland's Wrongful Death Act is that under the Maryland statute, "suit is brought in the name of a person entitled to recover, and to the use of all such parties who may have an interest." *Walker*, 318 Md. at 523, 569 A.2d at 648; *see Robinson v. Lewis*, 20 Md. App. 710, 714, 317 A.2d 854, 857 (1974) (explaining that wrongful death suits arising within the state must now be filed in the name of the real parties in interest, rather than in the name of the State). We note that unlike most other states, Maryland has two independent causes of action for the beneficiaries of a tort victim to bring following the victim's death: a survival action and a wrongful death action. The former is in the name of the personal representative for any claim the deceased person could have maintained during his or her lifetime and the

30

latter claim is brought on behalf of the surviving heirs or beneficiaries for their loss resulting from the death of a spouse, parent or child. *Walker*, 318 Md. at 523, 569 A.2d at 648. It follows then, based on the history of the wrongful death cause of action, that a beneficiary (or a personal representative with an interest) would bring the suit for the use of the other parties in interest.

Md. Code (1973, 2006 Repl. Vol.), § 3-904 of the Courts and Judicial Proceedings Article (hereinafter § 3-904) and Md. Rule 15-1001 govern the proper procedures for a wrongful death action. Section 3-904 provides, in pertinent part:

(a) Primary beneficiaries.
   (1) Except as provided in paragraphs (2) and (3) of this subsection, an action under this subtitle shall be for the benefit of the wife, husband, parent, and child of the deceased person.

\* \* \* \*

(b) Secondary beneficiaries. If there are no persons who qualify under subsection (a), an action shall be for the benefit of any person related to the deceased person by blood or marriage who was substantially dependent upon the deceased.

(c) Damages to be divided among beneficiaries.
   (1) In an action under this subtitle, damages may be awarded to the beneficiaries proportioned to the injury resulting from the wrongful death.
   (2) Subject to § 11-108(d)(2) of this article, the amount recovered shall be divided among the beneficiaries in shares directed by the verdict.

\* \* \* \*

(f) Restriction to one action under this subtitle. Only one action under this subtitle lies in respect to the death of a person.

(g) Action to commence within three years; deaths caused by occupational disease.

31

(1) Except as provided in paragraph (2) or (3) of this subsection, an action under this subtitle shall be filed within three years after the death of the injured person.

(2)(i) In this paragraph, "occupational disease" means a disease caused by exposure to any toxic substance in the person's workplace and contracted by a person in the course of the person's employment.

   (ii) If an occupational disease was a cause of a person's death, an action shall be filed:

       1. Within 10 years of the time of death; or

       2. Within 3 years of the date when the cause of death was discovered, whichever is the shorter.

We point out that section (f), known as the "one action rule," codifies one of the main policies underlying wrongful death statutes. This Court has explained that "the purpose of the one action rule is to protect a defendant from being vexed by several suits instituted by or on behalf of different equitable plaintiffs for the same injury, when all the parties could be joined in one proceeding." *Walker*, 318 Md. at 523, 569 A.2d at 648. Moreover, § 3-904(c) requires that "if a recovery or verdict is obtained in this one action, the amount recovered shall be divided among the beneficiaries in shares directed by the verdict." *Id*. The statute does not allow for claims to be severed, and "[a] judgment should not [be] entered in the circuit court unless it included the interests of all the known beneficiaries." *Walker*, 318 Md. at 524, 569 A.2d at 648.

In an attempt to decipher the state of the law regarding joinder of use plaintiffs at the time of the present trial, we discovered that the case law interpreting Md. Rule 15-1001 (governing the procedures for a wrongful death action) to be less than clear. To thoroughly explain our holding here, we must explain how this Rule has evolved, starting before the

32

commencement of this action, and ending with the 2013 amendment to the Rule. This

Court's recent opinion in *University of Maryland Medical System Corp. v. Muti*, 426 Md.

358, 44 A.3d 380 (2012), is the catalyst of this evolution. We therefore proceed by first

explaining the law prior to *Muti*. We next explain the clarification and affirmative mandate

imposed by the decision in *Muti*, and finally, we explain the 2012 amendments to Rule 15-

1001, which were drafted in accordance with and as further clarification of *Muti*.

Prior to, and for the duration of the trial in the instant case, Md. Rule 15-1001 stated:

(a) Applicability. This Rule applies to an action involving a claim for damages for wrongful death.

(b) Plaintiff. If the wrongful act occurred in this State, all persons who are or may be entitled by law to damages by reason of the wrongful death shall be named as plaintiffs whether or not they join in the action. The words "to the use of" shall precede the name of any person named as a plaintiff who does not join in the action.

(c) Notice to Use Plaintiffs. The party bringing the action shall mail a copy of the complaint by certified mail to any use plaintiff at the use plaintiff's last known address. Proof of mailing shall be filed as provided in Rule 2-126.

(d) Complaint. In addition to complying with Rules 2-303 through 2-305, the complaint shall state the relationship of each plaintiff to the decedent whose death is alleged to have been caused by the wrongful act.

The conclusions drawn from the case law interpreting Rule 15-1001 (prior to *Muti*)

can be summarized in two general propositions: (1) Maryland Rule 15-1001(b) did not

require formal joinder; and (2) Maryland Rule 15-1001 was more than just a notice rule

because use plaintiffs are real parties in interest whose interests must be acknowledged and

protected throughout the litigation. *Ace American Ins. Co. v. Williams*, 418 Md. 400, 422,

33

424, 15 A.3d 761, 774-75 (2011); *Williams v. Work*, 192 Md. App. 438, 455, 995 A.2d 744, 755 (2010). In 2010, prior to the conclusion of trial in the present case, the Court of Special Appeals in *Work* concluded that:

> Maryland law . . . makes clear that all beneficiaries in wrongful death lawsuits are the real parties in interest in these suits. Indeed, if one of a decedent's beneficiaries is absent from a wrongful death lawsuit, Maryland law requires that a judgment rendered in favor of the beneficiary or beneficiaries who did prosecute the suit be vacated.
>
> \* \* \* \*
>
> Although Rule 15-1001(b) does not require the statutory beneficiaries to formally join the litigation, all persons who are or may be entitled by law to damages by reason of the wrongful death shall be named as plaintiffs. *The words "to the use of" simply identify plaintiffs who have not formally joined the action, but, as real parties in interest, they are plaintiffs whose interests must be acknowledged and protected throughout the litigation.*
>
> *Although Rule 15-1001(b) does not require formal joinder*, the failure to include a known statutory beneficiary as a plaintiff or a "use plaintiff" in a wrongful death action and to settle without providing for that beneficiary can be analogized to the failure to join a necessary party in an action where joinder is required.

192 Md. App. at 454-55, 995 A.2d at 754-55 (emphasis added) (quotations and citations omitted).

In addition, one of the respondents in *Work* argued that Rule 15-1001 is simply a notice rule, and so long as use plaintiffs are properly designated as such in the complaint, the Rule is satisfied when the party plaintiffs' attorneys give the use plaintiffs notice of the action. 192 Md. App. at 460, 995 A.2d at 758. The court in *Work* explained that if it were to follow the theory that Rule 15-1001 was only a notice rule, once the use plaintiffs were

notified of the complaint, the burden would then fall upon them to join or intervene in the wrongful death action in order to protect their interests. *Id.* In explicitly rejecting this theory, the court in *Work* stated:

> To interpret the Rule as simply a notice rule disregards: (1) the representative nature of wrongful death actions; (2) the language of Rule 15-1001(b), requiring that all persons who are or may be entitled by law to damages by reason of the wrongful death shall be named as plaintiffs whether or not they join in the action; and (3) the provisions of Cts. & Jud. Proc. § 3-904(c) relating to the award of damages to the statutory beneficiaries proportional to injury resulting from the wrongful death.

*Id.* (quotations omitted). It can be inferred from this excerpt that plaintiffs' attorneys must have, to some as yet undefined extent, presumably acted on behalf of and represented the interests of those statutory beneficiaries entitled to damages, and that the burden to intervene did not fall on the use plaintiffs.[13]

The following year, on March 21, 2011, this Court adopted the Court of Special Appeals's express interpretation of Rule 15-1001. *See Ace,* 418 Md. at 427, 15 A.3d at 777 ("We agree with the COSA's interpretation of Md. Rule 15–1001(b), which is entirely consistent with our holding in *Walker v. Essex, supra*, as well as with the provisions of CJ

---

[13] The *Work* opinion involved an attempt by the circuit court to approve the settlement of a wrongful death case where the use plaintiffs were not properly designated. The original settlement agreement made no mention of the decedent's two sons from a previous marriage. The Court of Special Appeals made clear that court approval of the wrongful death settlement can occur only when there has been some effort to achieve the consent of all known beneficiaries.

§ 3–904.").[14]  Therefore, for the duration of the trial in the present case, this Court's and the Court of Special Appeals's interpretation of Rule 15-1001 was the only relevant instruction to use plaintiffs concerning the proper procedure to join in an action for damages alleging wrongful death.

The first affirmative directive to use plaintiffs explaining how to join in a wrongful death action occurred in this Court's 2012 opinion in *Muti*.  In that case, this Court undertook the task of clarifying the case law on use plaintiffs.  In a section entitled "Some Considered Dicta," the majority opinion explained the standard for a named use plaintiff to join in the wrongful death action when it stated:

> Rule 15-1001(b) distinguishes between those beneficiaries who join in the action for damages and those, the use plaintiffs, who do not.  Use plaintiffs who wish to assert their respective claims for damages must timely join the action by indicating to the court and to the original parties in some clear fashion that they are claiming their "share."  Ordinarily, this is done by intervening.

*Muti*, 426 Md. at 384, 44 A.3d at 395.  *See Schmidt v. Prince George's Hosp.*, 366 Md. 535, 551, 784 A.2d 1112, 1121 (2001) ("When a question of law is raised properly by the issues in a case and the Court supplies a deliberate expression of its opinion upon that question, such opinion is not to be regarded as *obiter dictum*, although the final judgment in the case may be rooted in another point also raised by the record.").

As stated previously, this "considered dicta" in *Muti* is the first affirmative, clear

---

[14] This Court's opinion in *Ace* was filed three weeks after the verdicts were rendered in the present case, but prior to the post-trial motions hearings.

attempt to delineate what is required of use plaintiffs to formally join a wrongful death action. From *Muti*, we conclude that use plaintiffs who wish to assert their claim for damages in a wrongful death action must, in a "clear fashion," indicate to the court and the original parties "that they are claiming their share." This statement is followed by the proposition that "[o]rdinarily, this is done by intervening." We read this statement to mean that the Court left open for interpretation the precise manner by which a use plaintiff could clearly claim his or her share, but the typical manner is by filing a motion to intervene.

The Rules Committee closed that door with its 2012 recommendation to amend Rule 15-1001 "to implement holdings of the Court in [*Muti*.]" Court of Appeals Standing Committee on Rules of Practice and Procedure, Meeting Minutes of June 21, 2012, at 105. The new version of Md. Rule 15-1001, which was amended in October 2012, and adopted by this Court, effective January 1, 2013, substantially incorporated the old iteration of sections (a) and (b). The new amendments to the Rule state:

> (c) Complaint. The complaint shall state (1) the relationship of each plaintiff to the decedent whose death is alleged to have been caused by the wrongful act, (2) the last known address of each use plaintiff, and (3) that the party bringing the action conducted a good faith and reasonably diligent effort to identify, locate, and name as use plaintiffs all individuals who might qualify as use plaintiffs. The court may not dismiss a complaint for failure to join all use plaintiffs if the court finds that the party bringing the action made such a good faith and reasonably diligent effort.

> (d) Notice to use plaintiff. The party bringing the action shall serve a copy of the complaint on each use plaintiff pursuant to Rule 2-121. The complaint shall be accompanied by a notice in substantially the following form:

> [Caption of case]

37

NOTICE TO                                          [Name of Use Plaintiff]

You may have a right under Maryland law to claim an award of damages in this action. You should consult Maryland Code, § 3-904 of the Courts Article for eligibility requirements. Only one action on behalf of all individuals entitled to make a claim is permitted. *If you decide to make a claim, you must file with the clerk of the court in which this action is pending a motion to intervene in the action in accordance with the Maryland Rules* no later than the earlier of (1) the applicable deadline stated in § 3-904 (g) and § 5-201 (a) of the Courts Article ["the statutory deadline"] or (2) 30 days after being served with the complaint and this Notice if you reside in Maryland, 60 days after being served if you reside elsewhere in the United States, or 90 days after being served if you reside outside of the United States ["the served notice deadline"]. You may represent yourself, or you may obtain an attorney to represent you. *If the court does not receive your written motion to intervene by the earlier of the applicable deadlines, the court may find that you have lost your right to participate in the action and claim any recovery.*

(e) Waiver by inaction.

      (1) Definitions. In this section and in section (f) of this Rule, "statutory deadline" means the applicable deadline stated in Code, Courts Article, § 3-904 (g) and § 5-201 (a), and "served notice deadline" means the additional applicable deadline stated in the notice given pursuant to section (d) of this Rule.

      (2) Failure to satisfy statutory time requirements. *An individual who fails to file a complaint or motion to intervene by the statutory deadline may not participate in the action or claim a recovery.*

      (3) Other late filing. If a use plaintiff who is served with a complaint and notice in accordance with section (d) of this Rule does not file a motion to intervene by the served notice deadline, the use plaintiff may not participate in the action or claim any recovery unless, for good cause shown, the court excuses the late filing. The court may not excuse the late filing if the statutory deadline is not met.

(f) Subsequently identified use plaintiff. Notwithstanding any time limitations contained in Rule 2-341 or in a scheduling order entered pursuant to Rule 2-504, if, despite conducting a good faith and reasonably diligent effort to identify, locate, and name all use plaintiffs, an individual entitled to be named as a use plaintiff is not identified until after the complaint is filed, but is identified by the statutory deadline, the newly identified use plaintiff shall be added by amendment to the complaint as soon as practicable and served in

accordance with section (d) of this Rule and Rule 2-341 (d). (Emphasis added.)

As the new language of the Rule makes quite plain, a use plaintiff is now required to file a motion to intervene in order to be joined as a party plaintiff in a wrongful death action. Therefore, the amendments to Rule 15-1001 effectively abrogate all prior case law holding that formal joinder is not required under Rule 15-1001.

With the evolution of Rule 15-1001 in mind, we return to the issue at bar: whether the use plaintiffs in the instant case did enough to join in the action *under the state of the law at the time of the filing of the amended complaints and through the duration of the trial*, in order to maintain a claim for damages. If the use plaintiffs did not do enough to join in the litigation prior to the expiration of the three year statute of limitations, they would be barred from recovery. To summarize, the case law in existence at the time of trial interpreting § 3-904 and Rule 15-1001, which govern wrongful death suits, dictates four general propositions: (1) "the purpose of the one action rule [in § 3-904(f)] is to protect a defendant from being vexed by several suits instituted by or on behalf of different equitable plaintiffs for the same injury, when all the parties could be joined in one proceeding;" (2) if a verdict is obtained in this single proceeding, it shall be divided among all of those beneficiaries who have an interest; *see Walker*, 318 Md. at 523, 569 A.2d at 648; (3) Maryland Rule 15-1001(b) did not require formal joinder; and (4) Maryland Rule 15-1001 is more than just a notice rule because use plaintiffs are real parties in interest whose interests must be acknowledged and protected throughout the litigation, *see Work*, 192 Md. App. at 454-55, 460, 995 A.2d at 755,

39

758.

Under the state of the law at the time of trial here, which was prior to this Court's decision in *Muti* and before the latest revisions to Rule 15-1001, the use plaintiffs were real parties in interest that were not required to formally join in the proceeding in order to share in an award for damages. Absent any clear direction or requirement that formal joinder was necessary, on the facts of this case, the use plaintiffs' knowing consent to and active participation in the litigation was the functional equivalent of joinder. Moreover, when "Rule 15-1001(b) does not require formal joinder," we see no plausible way for a named use plaintiff's "interests [to] be acknowledged and protected throughout the litigation" other than to include them in the process towards judgment. *See Work*, 192 Md. App. at 455, 995 A.2d at 755. Indeed, the use plaintiffs' non-joinder was not fatal to their claim for damages because they were beneficiaries with a cognizable interest in the litigation. *See Johnson v. Price*, 191 F. Supp. 2d 626, 629 (D. Md. 2001) (holding that the use plaintiff had "a real, legally cognizable interest" and her rights "must be adjudicated as part of the wrongful death suit brought by her mother"). There would need to have been some other applicable law[15]

---

[15] We reviewed the Maryland Rules governing parties, including Rule 2-201 (Real Parties in Interest), Rule 2-211 (Required Joinder of Parties), and Rule 2-212 (Permissive Joinder of Parties). Although Rule 2-211 and 2-212 explain when and why joinder is required or permissive in some situations, these rules do not give direction as to *how* a party is to actually join a lawsuit. In Rule 2-201, the only direction to use plaintiffs is in regard to a situation where the action is brought in the name of someone without an interest, and calls for an "objection for joinder or substitution of the real party in interest." In contrast, the action here was brought in the name of real parties in interest, so objection for joinder would not be appropriate. Additionally, there is no directive as to *how* to "substitute" the real parties

(continued...)

specifically requiring the use plaintiffs to take affirmative steps to join in the action; it appears, however, that use plaintiffs could essentially obtain a "free ride"[16] under the state of the law at the time of the trial in the present case. This Court in *Muti* recognized this problem and clarified the need for the use plaintiff to affirmatively join the case.

We find this situation analogous to the facts in *Hayden v. Wesner*, 52 Md. App. 323, 449 A.2d 436 (1982). In that case, a complaint for damages was filed, designating the plaintiffs as "State of Maryland for the Benefit of Rose Elizabeth Wesner and Rose Elizabeth Wesner, Personal Representative of Edward Lee Morgan." *Hayden*, 52 Md. App. at 324, 449 A.2d at 436. Rose Wesner, the mother of the decedent, never formally joined the proceedings. After the jury returned a verdict in Mrs. Wesner's favor, the defendant-appellant thereafter objected for want of necessary parties. *Hayden*, 52 Md. App. at 324-25, 449 A.2d at 436-37. The intermediate appellate court held that "there was no lack of necessary parties. Mrs. Wesner, the mother of the slain child, was the party plaintiff, albeit

---

(...continued)
in interest under Rule 2-201, and therefore, we find no rule requiring use plaintiffs to take specific affirmative steps to join in this case.

[16] Indeed, this exact problem was highlighted in an article authored in 2008 concerning ethical obligations revolving around use plaintiffs in Maryland wrongful death cases. The author opined about the "troublesome" nature of a "free ride use plaintiff who does not hire an attorney, who refuses to contribute to costs, who refuses to agree to share the responsibility for attorney's fees, and who [thereafter] insists on participating in the settlement or judgment[.]" Robert R. Michael, *The "Use" Plaintiff in Maryland Wrongful Death Cases: Some Ethical Observations*, Trial Reporter 13 (Fall 2008). We believe that this problem was one of the considerations when the Rules Committee recommended amending Rule 15-1001 in 2012 to require formal joinder in such actions, and has since been remedied.

41

a misdesignated one.  Naming her as a 'use plaintiff' instead of bringing the action in her own name amounts to no more than an error in styling rather than one of substance." *Hayden*, 52 Md. App. at 326, 449 A.2d at 437.  The court further elaborated that "[i]t was obvious to [the trial judge], the jury, and the appellant that the real party plaintiff was the appellee, Mrs. Wesner, and the appellant acknowledges that he was not harmed, surprised, or placed at a disadvantage by the mislabeling of the declaration." *Id.*  Rather, the defendant-appellant knew of his right to object to the failure to join Mrs. Wesner throughout the course of the trial, "but was content to lie in wait and then play 'his ace in the hole' if the verdict was in favor of Mrs. Wesner or was in an amount greater than the appellant deemed proper." *Hayden*, 52 Md. App. at 325, 449 A.2d at 437.

This conclusion in *Hayden* is one dictated by fairness and is also a conclusion applicable to the case at bar: it was obvious to everyone involved in the case that the use plaintiffs were parties to the litigation, and in addition, WGAST was not surprised or disadvantaged because the use plaintiffs here did not formally join in the proceedings. Petitioners pointed to a number of facts that support these propositions: all use plaintiffs were identified in discovery, they were listed as "plaintiffs" in the proposed voir dire, most of them were deposed at the same time as the four party plaintiffs, they were introduced to the jury, all but three testified at trial and were subjected to cross-examination, and each of the use plaintiffs was listed on the verdict sheet and obtained individual awards resulting in money judgments.

We also point out that, although occurring inconsistently, the use plaintiffs were listed as plaintiffs in several of the filings, including a Motion By Interlineation to add W&G as a party defendant and in a notice of deposition. At oral argument in this Court, Petitioners' counsel asserted that all 19 plaintiffs were represented by the same law firm from at least as far back as when the cases were consolidated for trial in 2009. In response to a question in open court from a member of this Court concerning who was representing the use plaintiffs and whether written fee agreements were "all done in this case," Petitioners' counsel asserted that "that is all done and we represented them the entire time at trial." Additionally, all twelve of the use plaintiffs that testified at trial were asked questions in order to establish their past relationship and familial bond with the deceased person and how the loss of the decedent affected them.[17]   Section 3-904(d) permits recovery of damages for "mental

---

[17] For example, when plaintiffs' counsel questioned use plaintiff Rufus Carter, Jr., he asked Rufus Carter Jr. questions such as:

> And can you describe for us your relationship with your father while you were growing up?

> What types of activities do you remember doing with your father growing up?

> How did that news [that your father had lung cancer] affect you?

> How often after your father's diagnosis would you see him?

> How, if at all, did your father influence your life?

We cannot imagine a reason for asking these questions other than to establish that the use plaintiff had a claim under the Wrongful Death Statute. All of the use plaintiffs that testified were asked similar questions.

43

anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education[.]" Testimony in this regard would be irrelevant unless the use plaintiffs indeed were pursuing a claim for damages. Neither the trial judge nor defense counsel objected to such lines of questioning. Finally, at a post-trial motions hearing conducted for the sole purpose of deciding the status of the use plaintiffs,[18] the trial judge decided that "there is no question that use plaintiffs have to be included. They're supposed to be included. They're necessary parties." It can reasonably be inferred from this and previous statements by the trial judge that had he been alerted earlier to the fact that the use plaintiffs were never formally joined, he would have joined them as party plaintiffs at the outset.

Respondent's retort is that the use plaintiffs do not appear on the docket sheets (except as judgment recipients), counsel never entered appearances on their behalf, and no motions were ever filed to join them in the case. Respondent argues that the use plaintiffs' supposed "participation" in the proceedings does not qualify them as party plaintiffs with a right to recover damages. We disagree. It is obvious that everyone involved, including Respondent's counsel, considered the use plaintiffs to be parties to the litigation. It is particularly telling that Respondent's counsel did not object to the line of questioning employed by plaintiffs' counsel that established the use plaintiffs' claims for damages. Moreover, Respondents make

---

[18] *See* section I.B., *supra*, for more details about this post-trial motions hearing. The substance of the hearing concerned whether the trial judge's earlier decision to include the use plaintiffs on the verdict sheet was proper.

44

no assertion of genuine surprise or genuine harm to them. We therefore hold that in this case, where use plaintiffs were named in the complaint and participated in the litigation, where it was obvious to everyone involved that they were parties claiming damages, and where WGAST was not genuinely disadvantaged by their addition to the action, the use plaintiffs were real parties in interest who were entitled to an award for damages. Prior to the expiration of the statute of limitations, the use plaintiffs had already effectively joined in the case. This is demonstrated by the fact that, prior to December 28, 2010, the earliest of the statute of limitations dates, all use plaintiffs were named in the amended complaints, were represented by counsel, and were listed in the proposed voir dire.

If we were evaluating the facts of this case under the state of the law following the filing of our opinion in *Muti*, but before the new amendments to Rule 15-1001 became effective, our inquiry would be whether the use plaintiffs did enough to indicate to the court and original parties in some clear fashion that they were claiming their share.[19] *See Muti*, 426 Md. at 384, 44 A.3d at 395. Because formal joinder was not required at that time, and because it was undisputed that the use plaintiffs did not formally join in the proceedings, we would turn to the facts as explained *supra* to analyze the use plaintiffs' actions under this standard. We would hold that where the use plaintiffs were known to all of the parties and

---

[19] If a trial involving a wrongful death cause of action occurred on or after May 3, 2012 (the filing date of *Muti*) and prior to January 1, 2013 (the effective date of the new amendments to 15-1001), this would be the standard under which appellate courts would evaluate whether the use plaintiffs properly joined in the action.

where they extensively participated in the litigation, they clearly and sufficiently indicated to the court that they were claiming their share. The trial judge says as much when he stated that the use plaintiffs were "supposed to be included," indicating that he was under the assumption that they had been or should have been parties throughout the course of the litigation.

We would further emphasize that the assertion in *Muti* that joinder is ordinarily accomplished by intervention does not mean it is the only method, but is the recommended one in order to avoid confusion and ambiguity. Where, as here, the designated use plaintiffs fully participated in the proceedings, both the trial judge and the use plaintiffs were undoubtedly under the assumption that they had properly joined the action. It appears as though the only party not operating under this assumption was WGAST, who belatedly pointed out the problem to the court following the presentation of the plaintiffs' case in chief.

Finally, we point out that if we were evaluating the facts of this case under the state of the law following the 2012 amendments to Rule 15-1001 (effective January 1, 2013), our inquiry would be whether the use plaintiffs "file[d] a complaint or motion to intervene by the statutory deadline." Rule 15-1001(e)(2). This would be a very brief inquiry because it is clear by all accounts that the use plaintiffs did not ever formally join in the present action. Therefore, if the trial in the case at bar took place on or after January 1, 2013, the use plaintiffs would all be barred from recovery because the statute of limitations would have run long before any formal joinder occurred. That not being the case, however, we shall hold

46

that the use plaintiffs, as real parties in interest, and as designated in the complaint filed with

the court, were part of the action for purposes of the trial resulting in jury verdicts and money

judgments entered in their favor.[20]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY. RESPONDENT TO PAY COSTS.**

---

[20] Because we hold that the use plaintiffs are not precluded from claims for damages, we do not reach the question of whether the relation back doctrine is applicable here.

Circuit Court for Baltimore City
Case No.: 24-X-09-000419
Argued date: May 5, 2014

IN THE COURT OF APPEALS
OF MARYLAND

No. 84
September Term, 2013

SONIA CARTER, *et al.*

v.

THE WALLACE & GALE ASBESTOS
SETTLEMENT TRUST

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
McDonald,
Rodowsky, Lawrence F. (Retired, Specially
        Assigned),
Raker, Irma S. (Retired, Specially
        Assigned),

JJ.

Concurring and Dissenting Opinion by Raker, J.,
which Battaglia, J., joins.

Filed: July 21, 2014

I disagree with the analysis of the majority as to the apportionment issue in the Hewitt case and thus, dissent from that portion of the majority opinion. I join the majority opinion in all other respects. For the reasons explained below, pursuant to Maryland Rule 8-604(d), I would remand the Hewitt case to the circuit court for a *Frye-Reed* hearing to determine whether the defense expert's theory that Hewitt's injury is capable of apportionment is generally accepted in the scientific community.

I believe that the Court of Special Appeals, Judge Shirley Watts writing for the Court, got it right in its analysis that apportionment concerns causation, not comparative negligence principles. I disagree with the majority's holding that in all cases, death is an indivisible injury as a matter of law and hence, not suitable for apportionment.

Death may be indivisible as to result, but it is not *per se* incapable of apportionment. Many courts around the country have permitted apportionment in death cases. *See e.g.*, *Brisboy v. Fibreboard Corp.*, 429 Mich. 540, 418 N.W.2d 650, 655 (1988) (permitting apportionment of damages in a wrongful death action based on smoking history and asbestos exposure); *Champagne v. Raybestos-Manhattan, Inc.*, 212 Conn. 509, 562 A.2d 1100, 1118 (1989) (same); *see also Poliseno v. General Motors Corp.*, 328 N.J. Super. 41, 744 A.2d 679, 687 (2000) (concluding that while death is indivisible as to result, it is capable of apportionment in terms of causation). In Maryland, the State Workers' Compensation Commission is compelled statutorily to apportion damages in workers' compensation cases involving a deceased employee. *See* Maryland Code (1991, 2008 Repl. Vol.) § 9-608 (noting that the "Commission shall determine the percentage that an occupational disease contributed

to the *death* or disability of a covered employee . . . ."). (emphasis added). In my view, a categorical rule that death is an indivisible injury incapable of apportionment speeds past an accepted principle of law: death can be capable of apportionment as to damages, but not as to fault. *See* Restatement (Third) of Torts: Physical and Emotional Harm § 28, cmt. d (2010) ("Death as an injury may not be divisible, but damages for death are divisible."); *see also* Gerald W. Boston, *Toxic Apportionment: A Causation and Risk Contribution Model*, 25 Envtl. L. 549, 568-69 (1995) (stating that although "comment i [to the Restatement (Second) of Torts §443A] states that death is the quintessential indivisible harm . . . deaths attributable to toxic causes, as when a plaintiff dies from lung cancer brought about by the combined effects of smoking and asbestos exposure, each of the contributing causes can be compared and the harm apportioned on that basis.").

In addition to the notion that death has been held to be an indivisible injury, the majority relies improperly on the one-sided evidence presented at trial to support its conclusion. The trial court, however, failed to consider the defendant's evidence on the issue of apportionment and relied solely on the plaintiff's experts, and the trial judge's own understanding, to support its ruling rejecting apportionment. Dr. Kerby, defendant's expert, was prepared to testify to the risk assessment involved with the causes at issue: smoking and exposure to asbestos. Dr. Kerby's proffer indicates that he would have testified that "the relative risks for each [history of smoking and exposure to asbestos] to the development of [the plaintiff's] lung cancer and death therefrom is 3 to 1, cigarette smoking to asbestos."

2

Further, he would have opined that the relative contribution of Hewitt's tobacco use and of his exposure to asbestos to the development of his lung cancer was 75% and 25%. The expert's testimony could have formed the basis for a reasonable basis of apportioning damages. *See* Boston, *supra*, at 555 (concluding that "[i]f the plaintiff's asbestos exposure and his smoking are both shown to be causal factors in the plaintiff's lung cancer, then the loss is necessarily capable of apportionment on the basis of the relative risks demonstrated for each kind of toxic exposure."). I would, instead, remand the case so that a *Frye-Reed* hearing would be held to determine if the opinion offered by Dr. Kerby met the standards for scientific testimony before it was accepted or rejected. *See Blackwell v. Wyeth*, 408 Md. 575, 588, 971 A.2d 235, 243 (2009); *see also Mayer v. North Arundel Hosp. Ass'n, Inc.*, 145 Md. App. 235, 254 n. 7, 802 A.2d 483 (2002) (noting that the initial burden is on the plaintiff to establish that a harm is indivisible and that "[a] defendant is free to put on evidence" to the contrary). Doing so, would have permitted the court to make an informed decision as to whether there was a reasonable basis for apportioning the injury. The majority's *per se* rule prevents a trial court from evaluating the merit of emerging scientific theories of causation.

Moreover, the question of apportionment, a process although sounding in comparative negligence, is a different animal. *See Mayer*, 145 Md. App. at 249, 802 A.2d at 491 (noting that in the context of apportionment of damages "we are talking about causal, not fault, apportionment"); *Poliseno*, 328 N.J. Super. at 55-56, 744 A.2d at 687-88 (explaining the distinction between apportionment based on causation principles and fault); Boston, *supra*,

3

at 580-85) (discussing the shortcomings of utilizing comparative fault principles as a justification for apportionment of damages); *see also Mayer*, 145 Md. App. at 249, 802 A.2d at 491 (noting that because the plaintiff had an injury prior to the negligent act committed by the defendant, "the question becomes one of apportionment of damages"); Maryland Civil Pattern Jury Instructions 10:4 ("A person who had a particular condition before the accident may be awarded damages for the aggravation or worsening of that condition."). Judge Watts, writing for the Court of Special Appeals, set out a well-reasoned analysis as to why apportionment can be appropriate notwithstanding this Court's allegiance to contributory negligence. I quote the opinion addressing this issue, in relevant part, as follows:

> "We begin by stating that the issue of apportionment concerns causation, not comparative negligence as appellees urge this Court to determine. Comparative fault or comparative negligence involves determination of the relative percentages of fault between joint tortfeasors–*i.e.* in a negligence action, comparative negligence involves looking at the respective duties and breaches of the joint tortfeasors. Such a system necessarily requires that a jury consider the actions of the joint tortfeasors leading up to the injury to determine whether both were at fault and, if so, how much of the fault each joint tortfeasor should shoulder. Maryland has explicitly rejected adopting comparative fault or comparative negligence in favor of maintaining contributory negligence. *See Franklin v. Morrison*, 350 Md. 144, 167-68 (1998); *Harrison v. Montgomery Cty. Bd. of Ed.,* 295 MD. 422, 463 (1983).
>
> Apportionment of damages, on the other hand, involves instances where there are two or more causes and a reasonable basis exists for determining the contribution of each cause to a single harm–*i.e.* in a negligence action, apportionment of damages involves looking at the causes of the injury, not the duties and breaches of the tortfeasors. Restatement (Second) of

4

Torts, Section 433A(1)(b). Under apportionment, the relative fault of the parties is not considered and the doctrine applies 'whenever two or more causes have combined to bring about harm to the plaintiff[.]' Restatement (Second) of Torts, Section 433A, cmt. a. This Court has adopted and applied apportionment of damages in certain cases. *See Bickerstaff*, 187 Md. App. at 249-51 (a FELA case); *Gress*, 150 Md. App. at 388-89, 388 n.11 (an asbestos case with asbestos industry and cigarette industry defendants); *Mayer*, 145 Md. App. at 249-50, 254-55 (a medical negligence case). Thus, the doctrines of apportionment of damages and comparative fault/negligence are distinct and involve different considerations.

Under relevant Maryland case law and the Restatement (Second) of Torts, apportionment of damages between several causes of an injury is appropriate in certain circumstances. Pursuant to Restatement (Second) of Torts, Section 433A(1), apportionment of damages between two or more causes is appropriate 'where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm.' Multiple causes may include the combination of acts of two or more parties, an innocent act and a negligent act, or an aggravation of a preexisting injury. Restatement (Second) of Torts, Section 433A, cmt. a."

I agree with the reasoning of the Court of Special Appeals that apportionment of damages is consistent with tort law in Maryland.

Because the trial court failed to conduct a *Frye-Reed* hearing, I would order a limited remand for an evidentiary hearing to ascertain whether the defense expert's theory that Hewitt's injury is capable of apportionment is generally accepted in the scientific community. *See Montgomery Mut. Ins. Co. v. Chesson*, 399 Md. 314, 333-34, 923 A.2d 939 (2007) (holding that a trial court's failure to conduct a *Frye-Reed* hearing is appropriate for a limited remand because it generally involves matters collateral to the substantive issues of a case and

verdicts should not be vacated unnecessarily).  On remand, if the trial court finds that the defense expert's methods and theories satisfy the *Frye-Reed* test, the trial court should vacate the judgment, order a new trial, and submit the issue of apportionment to the jury.  If the court finds to the contrary, the judgment should stand.  *See id.* at 336, 923 A.2d at 951.

Judge Battaglia authorizes me to state that she joins in this concurring and dissenting opinion.